UNITED STATES *v.* CONSOLIDATED KANSAS CITY SMELTING & REFINING Co. (No. 1843).[1]

UNITED STATES *v.* CONSOLIDATED KANSAS CITY SMELTING & REFINING Co. (No. 1843).

1. CONSTRUCTION, SUBSECTION 1, PARAGRAPH N, SECTION 4, TARIFF ACT OF 1913—"ASSAYED ACCORDING TO COMMERCIAL METHODS."

It was not the intention of Congress that duty on ores should be assessed on a greater metal content than that commercially producible from the ores; and a method of assaying which shows the actual quantity of metal in the ore, which is greater than that producible from it by the ordinary smelting processes, exceeds the requirement of subsection 1, paragraph N, section 4, tariff act of 1913, that the ores shall be "assayed according to commercial methods."

2. ASSAY OF LEAD ORE.

It being shown that the wet assay of lead ores shows a greater lead content than that *commercially* available and that a deduction from it of 1½ per cent of the weight of the ore is the ordinary commercial method by which the quantity of lead in ores is ascertained and paid for, the decision of the Board of United States General Appraisers permitting the reduction and refusing to follow the Treasury Department's direction to collectors to assess upon the basis of the wet assay is affirmed.

United States Court of Customs Appeals, May 22, 1918.

APPEAL from Board of United States General Appraisers, G. A. 8044 (T. D. 37078).

[Affirmed.]

*Bert Hanson,* Assistant Attorney General (*Frank P. Wilson,* special attorney, of counsel), for the United States.

*Gerry & Wakefield* for appellee.

[Oral argument Apr. 16, 1918, by Mr. Wilson and Mr. Wakefield.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

In 1899—see In re Puget Sound Reduction Co. (96 Fed., 90)—the Circuit Court considered the methods of determining the lead content of ores imported under the provisions of statutes then in force, referred to in its opinion. Among other things the court held in substance that the method of assaying contemplated by the statutes was the commercial method, that no other would satisfy the law, and that what was such method must be determined upon the evidence. It was held that the fire assay was the commercial method, and in discussing the evidence the court said that while the wet process was the best for estimating accurately the actual quantity of lead contained in ore—

The fire method is the fairest in a business sense, for by that method the amount of lead which can be saved by the process of smelting can be more accurately ascertained; the difference between the two methods is approximately the amount of lead which is necessarily lost in the process of smelting.

Paragraph 181 of the tariff act of 1909 contained provisions not materially unlike those reviewed by the court in the cited case.

---

[1] T. D. 37665 (34 Treas. Dec., 487).

Paragraph 152 of the act of 1913 provides that lead-bearing ores of all kinds which contain more than 3 per cent of lead shall pay a duty of three-fourths cent per pound on the lead contained therein. The provisions for sampling and assaying the ores are practically identical with those of the act of 1909.

Subsection 1 of paragraph N of section 4 of the act of 1913 contains provisions for the removal of lead-bearing and other ores to bonded smelting warehouses and the smelting and refining of the same there, upon compliance with conditions set forth in the subsection, and it seems that the ores involved in this case are within those provisions. It is also therein provided that the ores "shall be sampled and assayed according to commercial methods under the supervision of Government officers, to be appointed by the Secretary of the Treasury and at the expense of the manufacturer" and also that the Secretary of the Treasury shall make regulations to carry out the provisions of that section.

It appears that there are three methods of assaying lead ores:

(1) The fire assay, which in methods approximate smelter operations;

(2) The wet assay, which is actually a chemical analysis of the ore and apparently gives its exact lead content (these were the methods considered by the Circuit Court in the case above mentioned); and

(3) The wet assay of a lead button, which may perhaps be described as a chemical analysis of a button of lead resulting from a fire assay.

The fire assay and the wet assay of the lead button, it appears, each show the approximate amount of lead obtained from the ore in commercial smelting operations, while the wet assay shows a greater lead content than the other two because both the others involve the loss by volatilization and other losses incident to the practical smelting of lead ores which in the wet assay do not occur.

The issue here is whether the contents of the lead ores for duty purposes under subsection 1 of paragraph N should be considered the result of the wet assay or whether such result should be reduced 1.5 units to make the dutiable content. This reduction is approximately the minimum difference between the results of the wet assay and the two other methods and is also approximately the minimum difference between the result of the wet assay and practical smelting operations. This deduction is $1\frac{1}{2}$ per cent of the gross amount of ore assayed. Concretely applied, the lead content of a mass of ore weighing, say, 2,000 pounds, which by the wet assay is ascertained to be 1,000 pounds of lead, will be thereby reduced 30 pounds, leaving 970 pounds of dutiable lead.

The Treasury Department, adopting the decision in In re Puget Sound Reduction Co., supra, thereafter employed the fire process in determining the lead content of the ores until January 25, 1905, when

it ruled that the fire method was unscientific and directed the employment of the wet assay with the deduction of 1.5 units therefrom as representing the commercial method of ascertaining the lead content of ores. This practice was followed by the department until March, 1915, when by directions to collectors, although adhering to the wet-assay method, it declined to longer allow the deduction of 1.5 units. The reasons which led the department to deny the deduction are not shown.

The board in the case at bar in a well-reasoned opinion allowed the deduction, stating that the denial thereof was not only contrary to the prevailing commercial method but was also a departure from the process of assaying lead-bearing ores which the department had recognized as the commercial test for many years and which Congress undoubtedly had in mind when it enacted the present statute.

The record here is voluminous and there are a large number of exhibits, comprising chiefly various contracts and settlement papers which tend in the main to show that the wet assay, the result thereof being diminished by the 1.5 units as above described, sometimes a little more than that, but apparently seldom if ever less, constitutes a basis upon which the commercial quantity of lead in ores is ascertained and paid for.

From what has been said, it appears that the assessment of duty upon the result of the wet assay with no deduction results in the payment of duty upon the lead content of an ore, which content when the ore has been smelted by the ordinary processes is not actually obtained.

The board has found in unmistakable terms that the result of the wet assay, diminished by 1.5 units, is the commercial method existing in the United States applicable to these lead ores, and we think this finding is justified by the evidence.

In view of the recited history of the subject matter of assessing duty upon lead-bearing ores, we conclude that it was not the intent of Congress that the lead content should be ascertained and duty thereon assessed upon the basis of a quantity greater than that commercially produced from the ores. While in a chemical sense the lead content of the ores is truly shown by the wet assay, yet it is, commercially speaking, but the theoretical content, and there does not appear to be any way of recovering or saving the entire chemical content in practical smelting operations commonly employed, so that while such theoretical content is actually imported, yet practically it never becomes a subject of commercial dealings in this country.

We think Congress intended the commercial lead content instead of that determined by chemical methods should be dutiable, and this view is rendered more probable when we consider that at the time

the statute was enacted and for some nine years prior thereto the administrative practice had been in accord with that view of the law.

For these reasons the judgment of the Board of General Appraisers ought to be, and is hereby, *affirmed.*