AMERICAN SMELTING & REFINING CO. *v*. UNITED STATES
(No. 2650)[1]

IRRECOVERABLE ZINC IN LEAD ORE.

Ore, imported for the recovery of its lead content, contained zinc, which was not only irrecoverable but detrimental. It can not be said that the zinc was not imported. Section 557, Tariff Act of 1922, providing for the destruction of merchandise entered in bond and relief from the payment of duty thereon, can not be invoked by the importer as to the residue containing the zinc. The lead content is dutiable under paragraph 392 and the zinc content under paragraph 394, Tariff Act of 1922.

United States Court of Customs Appeals, February 25, 1926

APPEAL from Board of United States General Appraisers, G. A. 9018 (T. D. 40990)

[Affirmed.]

*Gerry & Wakefield* for appellant.
*William W. Hoppin*, Assistant Attorney General (*John G. Lerch* and *John A. Kemp*, special attorneys, of counsel), for the United States.

[Oral argument December 9, 1925, by Mr. Gerry and Mr. Lerch]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellant, American Smelting & Refining Co., imported, December 23, 1922, at Perth Amboy, N. J., two lots of crude ore, which ores contained silver, lead, zinc, and other metallic elements. On wet assay, without deduction, they were found and reported by the Government assayer to contain the following percentages of lead and zinc:

|  | Lead | Zinc |
|---|---|---|
| 40 bags | 35. 10 | 34. 00 |
| 260 bags | 23. 40 | 38. 80 |

The appellant owns and operates at Perth Amboy, N. J., a lead smelting and refining plant duly designated as a bonded smelting warehouse under the provisions of section 312 of the Tariff Act of 1922, hereinafter quoted. The ores in question here were removed to the said bonded smelting warehouse of appellant and were there smelted and refined. On the hearing before the board, two witnesses were called by the importer to testify concerning the process followed in these smelting and refining operations. E. W. Donohue, metallurgist and superintendent of appellant, stated that the ores in question were smelted in the lead blast furnace, from which process lead bullion resulted, but that no zinc was recovered. As to the zinc present in the ore, he said:

Q. Can you state what was done to lots 0462 and 0463?—A. Yes; they were smelted in the lead blast furnace.

Q. State the result of that smelting?—A. It made a slag, it made lead bullion.

Q. Was any zinc recovered from lots 0462 and 0463?—A. No, sir.

Q. State how zinc, if any, operates—how it did operate in the smelting of these lots 0462 and 3—was its presence beneficial or otherwise?—A. The presence of zinc is very detrimental.

Q. Why?—A. It makes the smelting very difficult, makes the slag less fluid, and it decreases the capacity of the furnace.

Q. Do you have to put into the furnace any other metals to take care of the zinc?—A. Yes, sir.

Q. What?—A. We dilute the zinc by adding other ores to change the slag composition.

Q. What becomes of the zinc?—A. It goes off with the slag.

Q. In what form?—A. Either oxide or spinel.

Q. Does the material put into the furnace take care of the zinc; oxidize the zinc?—A. It takes it away to a greater degree.

The other witness was Herbert M. Eyerkuss, chemist and assayer for the importer, with 22 years experience as such. As to the zinc content, he stated:

Q. Did you analyze these lots 0462 and 0463?—A. Yes, sir.

Q. What did they contain?—A. A little gold and silver, quite some silver, lead, copper, arsenic, antimony, no bismuth, nickel or cobalt or tin.

Q. Did they contain any zinc?—A. Yes, sir.

Q. What quantity?—A. Well, there is one 33 and the other is 24. We have a copy of it—0463 was 33 per centum and 0462 had 24.4 per centum.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Q. From your metallurgical experience state whether or not the zinc was a detriment or otherwise in the case of the treatment of this ore?—A. We have never recovered any zinc from any ores that we have ever received since I have been——

Judge FISCHER. That is not the question. You were asked whether it is a detriment or not.

A. Yes, it is a detriment.

Q. Why?—A. Because they have to add either iron to take care of the zinc or it forms a sort of mush slag that decreases the capacity of the furnace, and so on.

Q. Is there any practical way by which the zinc in lots 0462 and 0463 could be recovered, that you know of?—A. No, sir.

Q. And saved with the other metals?—A. No, sir.

Q. Did you make any effort to recover the zinc?—A. No, sir.

Q. Then you are not prepared to state that the zinc contained in the ore could not be recovered?—A. I think, yes, it could be recovered, but not as a commercial proposition.

Q. I am not asking you as to whether as a commercial proposition. Can it be recovered?—A. Then I don't know.

Q. Are you prepared to say it can not be recovered?—A. That I will not say.

No further evidence appears in the record on this point.

After the smelting, appellant made a withdrawal entry for consumption of the lead recovered by the smelting operation. The collector thereupon assessed duty upon the lead content of the ores imported, as shown by the assay, at 1½ cents per pound, under paragraph 392 of said act and upon the zinc content, as per assay, at 1½ cents per pound, under paragraph 394 of said act.

On December 6, 1923, the importer filed with the collector of customs a request, which is as follows:

Referring to the attached entry dated December 23rd, 1923, No. 433 P. A. covering 15 tons of lead ore, containing 34.00% (38.80%) percentage of zinc, we have to request that the said zinc be destroyed at our expense within the bonded period under customs supervision in lieu of exportation, and that we be relieved of the payment of duties thereon, pursuant to the provisions of section 557 of the act of September 21, 1922.

On the same day importer protested against the classification made by the collector, claiming, in substance, as follows:

1. That the ore in question was not "zinc-bearing ore," within the meaning of said paragraph 394, and is not subject to duty. 2. That the said zinc is not imported merchandise. 3. That duty was imposed upon a quantity of zinc in excess of that producible from the smelting of the ores in question. 4. That the zinc has been destroyed, as provided by section 557 of said tariff act, and that importer should therefore be relieved of the payment of duties thereon. The court below, after hearing the matter, sustained the classification of the collector, and overruled the protest. Importer appeals.

The first contention made by appellant is that the ores imported were not "zinc-bearing ores" within the meaning of the statute. Paragraphs 392 and 394, under which duties were imposed herein, are as follows:

PAR. 392. Lead-bearing ores and mattes of all kinds, 1½ cents per pound on the lead contained therein: *Provided,* That such duty shall not be applied to the lead contained in copper mattes unless actually recovered: *Provided further,* That on all importations of lead-bearing ores and mattes of all kinds the duties shall be estimated at the port of entry and a bond given in double the amount of such estimated duties for the transportation of the ores or mattes by common carriers bonded for the transportation of appraised or unappraised merchandise to properly equipped sampling or smelting establishments, whether designated as bonded warehouses or otherwise. On the arrival of the ores or mattes at such establishments they shall be sampled according to commercial methods under the supervision of Government officers, who shall be stationed at such establishments, and who shall submit the samples thus obtained to a Government assayer, designated by the Secretary of the Treasury, who shall make a proper assay of the sample and report the result to the proper customs officers, and the import entries shall be liquidated thereon. And the Secretary of the Treasury is authorized to make all necessary regulations to enforce the provisions of this paragraph.

PAR. 394. Zinc-bearing ore of all kinds, containing less than 10 per centum of zinc, shall be admitted free of duty; containing 10 per centum or more of zinc and less than 20 per centum, one-half of 1 cent per pound on the zinc contained therein; containing 20 per centum or more of zinc and less than 25 per centum, 1 cent per pound on the zinc contained therein; containing 25 per centum of zinc, or more, 1½ cents per pound on the zinc contained therein: *Provided,* That on all importations of zinc-bearing ores the duties shall be estimated at the port of entry, and a bond given in double the amount of such estimated duties for the transportation of the ores by common carriers bonded for the transportation of appraised or unappraised merchandise to properly equipped sampling or

smelting establishments, whether designated as bonded warehouses or otherwise.. On the arrival of the ores at such establishments they shall be sampled according to commercial methods under the supervision of Government officers, who shall be stationed at such establishments, and who shall submit the samples thus obtained to a Government assayer, designated by the Secretary of the Treasury, who shall make a proper assay of the sample and report the result to the proper customs officers, and the import entries shall be liquidated thereon. And the Secretary of the Treasury is authorized to make all necessary regulations to enforce the provisions of this paragraph.

Early in its history this court had occasion to pass upon a somewhat similar matter. *Consolidated Kansas City Smelting & Refining Co.* v. *United States*, 1 Ct. Cust. Appls. 472. There ore containing both lead and zinc, the latter in excess of 10 per centum, had been imported. No question of the bonded smelting warehouse was there involved, but importer claimed the ore was to be smelted for lead alone, and that, therefore, the zinc content ought not to be considered. Montgomery, Presiding Judge, speaking for the court, called attention to the testimony in that case showing that the ores. in question might be smelted either for zinc or lead, and said:

So it appears by this testimony most clearly that ores may be both zinc-bearing ores and lead-bearing ores, and that each of the ores may be recovered and the ore profitably manipulated for their recovery by the process of concentration and smelting several ores by the appropriate method. This being the case, it is hardly conceivable that Congress intended that zinc-bearing ore which also contained lead might be dutiable only for the zinc or that lead-bearing ore which contained zinc might be dutiable only for the lead. A most significant feature of this act is that while the actual smelting of zinc ores is only practicable when there is present 35 per centum of the zinc content, section 193 in very clear terms makes all zinc-bearing ore containing 10 per centum subject to duty. It is very clear from this that it was within the contemplation of Congress that ores which required mechanical treatment to concentrate them in preparation for the retort used in reclaiming the zinc should be dutiable in their crude state. Indeed this language requires that all ores containing a greater quantity than 10 per centum of zinc must be treated as zinc ores and assessed under paragraph 193. As is pointed out by the Board of General Appraisers in their opinion, Congress has provided for a duty on the metal content of ores rather than on the recovered metal itself.

We think the same reasoning applies to paragraph 394. Paragraph 394 plainly states that an imported ore containing 10 per centum or more of zinc is a zinc-bearing ore. If this be a correct deduction, then it follows that both the lead and zinc contents are dutiable, unless prevented by some other rule of law.

We pass to the next suggestion, made by appellant. Congress first recognized the desirability of establishing smelting plants in the United States where imported ores might be treated, by section 24 of the tariff act of October 1, 1890. That section provided that metals in a crude form might be removed to bonded smelting warehouses, without the payment of duty, be there smelted and refined,

and that each day a "quantity of refined metal equal to the amount of imported metal refined that day shall be set aside," and that such metal might be exported or removed from the warehouse, "upon entry for, and payment of duties, for domestic consumption." Following that act the Customs Regulations of 1892 promulgated by the Treasury Department, provided:

ART. 708. * * * Upon a withdrawal for consumption in the United States of any refined dutiable metals set aside and stored as equivalent for the metals contained in the imported crude metals or ores smelted in such warehouse, duty will be collected on the corresponding quantity as shown by the original assay, of such imported crude metals or ores, without any allowance for wastage incurred in the smelting and refining, but upon the exportation of said refined metal credit will be given on the warehouse bond for the duties on such corresponding quantity of the imported crude metals or ores shown by the assay, and 10 per centum of the quantity so shown in addition thereto.

To a like effect was section 21 of the tariff act of August 27, 1894. A similar provision was contained in the tariff act of July 24, 1897, section 29, the only essential difference being that but 90 per centum of the ores or metals in question was required to be set aside. Under this act, the Treasury Department issued the Customs Regulations of 1899 and 1908. Article 1080 of the former, and article 544 of the latter regulations, were identical and provided:

Upon the withdrawal for consumption in the United States of any portion of the smelted or refined dutiable metal or metals set aside and stored as herein prescribed, duty will be exacted on the entire importation from which such metal or metals were smelted or refined, the same as if the said importation had been entered originally for consumption. On the exportation of such smelted or refined metal or metals, credit will be given on the warehouse bond for the ore or crude metal covered thereby.

Said section 29 of the act of 1897 came under observation by the Board of General Appraisers in T. D. 23383, 4 Treas. Dec. 918. In that case ores containing antimony and lead, each dutiable under the act, were imported and sent to a bonded smelting warehouse. Duty was assessed on 90 per centum of the amount of lead and antimony as shown by the assay, while it was claimed by the importer that duty could only, under said section 29, be assessed on the amount of such metals actually produced as a result of the smelting and refining processes. The board held, in an illuminating opinion by De Vries, G. A., that the amount of duty should be ascertained by reference to the amount imported, as shown by the assay, and that the only allowance for wastage provided for was the 10 per centum margin between the imported ores or metals and the 90 per centum required by the act to be set aside.

An appeal was taken from that decision to the Circuit Court of the District of New Jersey, where it was reversed in *In re Guggenheim Smelting Co.*, 121 Fed. 153. On further appeal, the judgment.

of the Circuit Court was reversed and the decision of the Board of General Appraisers affirmed, in 126 Fed. 728. In that case it was argued, as here, that to fail to make an assessment of duties according to the amount of metals actually produced was to discriminate against American bonded smelting warehouses. As to this argument, the court said:

* * * We can not concur in the view that the object of the provision that only 90 per centum of the imported metal need be exported was to leave in the hands of those engaged in smelting or refining a bonus to foster or promote these industries. No such intent is expressed in the act, but, on the contrary, it clearly appears that protective duties, affecting all alike, were the only means by which it was proposed "to encourage the industries of the United States," and that nothing in the nature of a subsidy, bounty, or reward was intended to be bestowed upon any of them. The correct explanation of this provision is very simple. In administering the tariff acts of October 1, 1890 (26 Stat. 567, c. 1244) and August 27, 1894 (28 Stat. 509, c. 349), it had been found that some loss always occurs in smelting or refining, so that the whole quantity of pure metal actually contained in the crude metal imported can not be actually recovered; and it was in view of this fact that the act of 1897, which in this respect was amendatory of the previous acts, required, not that the whole quantity of pure metal imported should be subsequently exported, but only a quantity equal to 90 per centum thereof. It may be, as has been insisted, that this allowance of 10 per centum for wastage is, at least as to antimony, not as great as it ought to be, but the question thus raised is for consideration by Congress. It is not, under this statute, for solution by the courts.

That holding was followed in T. D. 25133, 7 Treas. Dec. 474.

The tariff act of August 5, 1909, section 24, changed the policy announced in the above cited decisions. Whether it was designed by Congress to meet and overcome the judicial construction we have mentioned, or not, is not apparent. It is certain, however, that the act of 1909 did change the policy as regards the collection of duties on ores entered at bonded smelting warehouses. Section 24 of said act provided that when such crude ores or metals were taken to a bonded smelting warehouse, the several charges on the bond would be canceled upon the exportation of the *lead* produced in such smelting and refining processes and that the "lead may be withdrawn for domestic consumption * * *, upon the payment of the duties chargeable against it in that condition."

In *American Smelting & Refining Co.* v. *United States*, 2 Ct. Cust. Appls. 231, certain antimonial lead, commonly known as typemetal, had been produced in a bonded smelting warehouse. It was classified for duty as lead bullion under paragraph 182 of the said act of 1909. The court, speaking through Smith, J., said, in part:

Instead of making the withdrawal of such lead dependent upon the payment of the duties which attached to it in its imported condition Congress explicitly provided that it might be withdrawn on the payment of the duties chargeable against it "in that condition," that is to say, the condition in which it was found after smelting or refining or both.

It is urged that *Consolidated Kansas City Smelting & Refining Co.* v. *United States*, 1 Ct. Cust. Appls. 472, holds otherwise. In that case, ores bearing both zinc and lead were entered for immediate consumption, and duties were imposed on both lead and zinc contents, under the provisions of paragraphs 181 and 193 of the said tariff act of 1909. The court held such duties properly imposed and said, when it was urged that section 24 of that act, the bonded smelting warehouse section, hereinbefore referred to, provided for the collection of duty on the lead content alone: "The record in the case before us does not show that the importer proceeded under this section." This case does not reach the point in issue here but only holds that when ores or crude metals were imported for immediate consumption under the act of 1909, they must be assessed with duties according to their mineral content, by assay.

Thus, it will be seen that, during the life of the said act of 1909, lead smelted and refined in bonded smelting warehouses paid duty only on the amount of refined metal actually produced, while ores imported for immediate consumption paid duty on their metallic contents.

Section IV, paragraph N, subsection 1, of the tariff act of October 3, 1913, was as follows:

N. Subsec. 1. That the works of manufacturers engaged in smelting or refining, or both, of ores and crude metals, may upon the giving of satisfactory bonds be designated as bonded smelting warehouses. Ores or crude metals may be removed from the vessel or other vehicle in which imported, or from a bonded warehouse, into a bonded smelting warehouse without the payment of duties thereon and there smelted or refined, or both, together with ores or crude metals of home or foreign production: *Provided,* That the bonds shall be charged with the amount of duties payable upon such ores and crude metals at the time of their importation, and the several charges against such bonds may be canceled upon the exportation or delivery to a bonded manufacturing warehouse established under paragraph M of this section of an amount of the same kind of metal equal to the actual amount of dutiable metal producible from the smelting or refining, or both, of such ores or crude metals as determined from time to time by the Secretary of the Treasury: *And provided further,* That the said metals so producible, or any portion thereof, may be withdrawn for domestic consumption, or transferred to a bonded customs warehouse, and withdrawn therefrom, and the several charges against the bonds canceled upon the payment of the duties chargeable against an equivalent amount of ores or crude metals from which said metal would be producible in their condition as imported: *And provided further,* That on the arrival of the ores and crude metals at such establishments they shall be sampled and assayed according to commercial methods under the supervision of Government officers, to be appointed by the Secretary of the Treasury and at the expense of the manufacturer: *Provided further,* That antimonial lead produced in said establishments may be withdrawn for consumption upon the payment of the duties chargeable against it as type metal under existing law and the charges against the bonds canceled in a similar sum: *Provided further,* That all labor performed and services rendered

pursuant to this section shall be under the supervision of an officer of the customs, to be appointed by the Secretary of the Treasury, and at the expense of the manufacturer: *Provided further*, That all regulations for the carrying out of this section shall be prescribed by the Secretary of the Treasury.

It will be noted that in paragraph N, quoted, it is provided:

That antimonial lead produced in said establishments may be withdrawn for consumption upon the payment of the duties chargeable against it as type metal under existing law and the charges against the bonds canceled in a similar sum.

Why was this proviso inserted? This court had held in *American Smelting & Refining Co.* v. *United States, supra*, under the act of 1909, that ores containing lead and antimony, smelted and refined in bonded warehouses, were dutiable only upon the antimonial lead, or type metal produced in smelting and refining. This decision constituted the adjudged law on the subject when the act of 1913 was approved. If, then, the act of 1913 did not change the act of 1909 in respect to the dutiability of ores and metals sent to bonded warehouses, why was this proviso deemed necessary and inserted in paragraph N? There can be but one reasonable deduction, that, without it, the law as to imported antimonial lead or type metal would be changed by the act of 1913. In other words, the Congress had changed the rule theretofore obtaining as to bonded smelting establishments, but expressly provided that no change should be made in arriving at the duties to be paid on antimonial lead.

On March 16, 1914, the Treasury Department issued a ruling known as T. D. 34280, relative to the appraisement of zinc in ore. This will be found in 26 Treas. Dec. 473. By this ruling, zinc ores are divided into four classes, the fourth class being:

(4) Zinc-bearing ore containing other metals, but the zinc not commercially recoverable, and in some instances a detriment, and the ore less valuable because of the presence of the zinc.

As to this class the department ruling says:

(3) Where the zinc is not commercially recoverable or is a detriment in the smelting of other metals, the department is of the opinion that such zinc is of no commercial value and that no duty accrues thereon.

Thereafter the Customs Regulations of August 13, 1915, were issued by the Treasury Department. These regulations provided, in part, as follows:

ART. 788. * * * An amount of lead equal to the lead contained in the imported ore or crude metal as ascertained by Government assay, less the wastage allowance, shall constitute the quantity of lead which must be either exported, transferred to a bonded manufacturing warehouse or bonded customs warehouse, or withdrawn for consumption, in order to secure the cancellation of the charge made against the bond. However, upon the withdrawal for consumption of lead smelted or refined, duty shall be collected upon the dutiable content of the quantity of ores or crude metals in their condition as imported from which

said lead was produced and without allowance for wastage or for zinc entirely lost in the smelting or refining, or both, except as allowed in appraisement on importation.

ART. 796. * * * However, when the refined lead is withdrawn for consumption, duty shall be collected on the dutiable lead and zinc contents of the imported ore from which the bullion was produced, no allowance for either smelting or refining wastage being permitted, nor for zinc entirely lost in the smelting or refining, or both, except as allowed in appraisement on importation.

These various departmental rulings were under observation in T. D. 35527, 28 Treas. Dec. 1154, decided June 8, 1915. There copper ores containing zinc were entered for consumption. It was claimed, as here, that the zinc was not recoverable, but a detriment. Attention was called to the departmental order of March 16, 1914, *supra.* But the board held both zinc and copper to be dutiable according to assay, irrespective of the said circular. The decision was followed in Abstract 38559, 29 Treas. Dec. 379.

Neither of the cases above cited was appealed and, so far as this court can ascertain, they constitute all the adjudged cases on the subject now available under the act of October 3, 1913.

It is argued by appellant here that the rulings of the Treasury Department under the act of 1913 were in conflict, as shown by the circular ruling of March 16, 1914, and the Customs Regulations of 1915, and that, because of this, the importer who imported his ores for immediate consumption was favored over and above the importer who conducted a bonded smelting warehouse; that the importer for consumption who entered zinc commercially irrecoverable was not required to pay duty upon it, while the bonded smelter importer must pay upon it. We have nothing to indicate here what may have been the administrative practice in that respect. We must assume, however, that the administrative practice followed the decisions of the Board of General Appraisers in that respect, and, as we have seen, the conclusions of said board were that such ores, imported for consumption, were dutiable according to their metallic content, by assay, and not free of duty, as suggested in the said circular ruling of March 16, 1914.

It is argued, by appellant, that it was the obvious intent of Congress, in enacting section 312 of the Tariff Act of 1922, to change the method theretofore followed of imposing duties upon ores or metals smelted or refined in bonded warehouses, according to their metallic content, by assay. That section follows. In quoting the same we have italicized such portions of the section as are new and not found in Section IV, paragraph N of the tariff act of October 3, 1913:

SEC. 312. That the works of manufacturers engaged in smelting or refining, or both, of ores and crude metals, may, upon the giving of satisfactory bonds, be designated as bonded smelting warehouses. Ores or crude metals may be removed from the vessel or other vehicle in which imported, or from a bonded

warehouse, into a bonded smelting warehouse without the payment of duties thereon, and there smelted or refined, or both, together with ores or crude metals of home or foreign production: *Provided,* That the bonds shall be charged with *a sum equal in amount to* the *regular* duties *which would have been* payable on such ores and crude metals *if entered for consumption* at the time of their importation, and the several charges against such bonds *shall* be canceled upon the exportation or delivery to a bonded manufacturing warehouse established under the preceding section of this title of a *quantity* of the same kind of metal equal to the *quantity* of metal producible from the smelting or refining, or both, of the *dutiable metal contained in such* ores or crude metals, *due allowance being made of the smelter wastage* as *ascertained* from time to time by the Secretary of the Treasury: *Provided further,* That the said metals so producible, or any portion thereof, may be withdrawn for domestic consumption or transferred to a bonded customs warehouse and withdrawn therefrom and the several charges against the bonds canceled upon the payment of the duties chargeable against an equivalent amount of ores or crude metals from which said metal would be producible in their condition as imported: *Provided further,* That on the arrival of the ores and crude metals at such establishments they shall be sampled and assayed according to commercial methods under the supervision of Government officers: *Provided further,* That all labor performed and services rendered pursuant to this section shall be under the supervision of an officer of the customs, to be appointed by the Secretary of the Treasury and at the expense of the manufacturer: *Provided further,* That all regulations for the carrying out of this section shall be prescribed by the Secretary of the Treasury: *And provided further, That the several charges against the bonds of any smelting warehouse established under the provisions of this section may be canceled upon the exportation or transfer to a bonded manufacturing warehouse from any other bonded smelting warehouse established under this section of a quantity of the same kind of metal, in excess of that covered by open bonds, equal to the amount of metal producible from the smelting or refining, or both, of the dutiable metal contained in the imported ores and crude metals, due allowance being made of the smelter wastage as ascertained from time to time by the Secretary of the Treasury.*

An inspection of section 312 shows that the portion thereof dealing with metals to be withdrawn from a bonded smelting warehouse for consumption is identical with the language of section IV, paragraph N, of the act of October 3, 1913. The only material change in the section is that relative to the allowance of smelter wastage, which smelter wastage is to be determined from time to time by the Secretary of the Treasury. A great deal of difficulty, and a degree of discrimination, had been occasioned by article 787 of the Treasury Regulations of 1915, which provided that ores imported for bonded warehouses should be assayed by the wet assay, without deduction. This was extended to ores other than those for bonded warehouses by the Treasury ruling of March 16, 1915, T. D. 35219. Thereafter this court held in *United States* v. *Consolidated Kansas City Smelting & Refining Co.,* 8 Ct. Cust. Appls. 406, that the wet assay, without deduction, was unfair and in contravention of good commercial practice, and held the wet assay with a deduction of 1.5 per centum to be the proper one to be used. Following that holding, the department issued T. D. 37688, 34 Treas. Dec. 574, correcting this error in practice in conformity with the decision of this court above

cited. It is apparent that Congress, in the Tariff Act of 1922, was attempting to so draft section 312 that it would conform with the ruling of this court in *United States* v. *Consolidated Kansas City Smelting & Refining Co., supra*, and secure to the importer, without question, a reasonable allowance for smelter wastage. Therefore section 312 provided that there should be "due allowance" for "smelter wastage." This was not a provision that irrecoverable minerals imported in ores of mixed content should pay no duty, but that a commercial allowance, to be fixed by the Secretary, should be made for the ordinary losses in smelting and refining. If this view required support it might well be found in the report of the Committee on Finance of the Senate, in reporting H. R. 7456, afterwards the Tariff Act of 1922, wherein it is said, in part:

> In the lead-ore paragraph the phraseology has been changed to conform with the present practice, which permits the free entry of somewhat more than 20 pounds per ton of the lead content of imported ore. While this was avoided in the phraseology of the House bill, the latter placed the bonded smelting interests at some disadvantage as compared with nonbonded works in view of existing Treasury regulations. The permanent duties on zinc metal were increased slightly in order to make them higher than those on the ore.

Aside from this change in language and meaning, no essential change was made by section 312 from the law as it existed prior to that time.

The language of section 312 is not ambiguous. It provides that the ores may be taken to bonded warehouses, under bond for the full amount of metals contained in the ores, by assay. The metals producible may be withdrawn for consumption when the same amount of duties are paid which might be charged upon the ores or crude metals, *in their condition as imported*, from which the metal smelted and refined, might be produced. In other words, in such cases, duties should be collected upon the ores or crude metals, according to assayed mineral content, which it required to produce the refined metal in question.

Importers conducting bonded smelting warehouses have been insisting, since 1903, as shown by *In Re Guggenheim Smelting Co.*, 126 Fed., *supra*, upon the privilege of free importation of irrecoverable metals, where smelting and refining is done in bonded warehouses. And yet, with consistency, both the statutory law and regulations of the Department of the Treasury, since that time, with the single exception of the period under the tariff act of August 5, 1909, have refused this exemption.

The Customs Regulations of 1923 provided, in conformity with the practice under the tariff act of October 3, 1913, article 905, in part:

> ART. 905. * * * However, upon the withdrawal for consumption of lead smelted or refined, duty shall be collected upon the dutiable content of the quan-

tity of ores or crude metals in their condition as imported from which said lead was produced and without allowance for wastage or for zinc entirely lost in the smelting or refining, or both, except as allowed in appraisement on importation.
\* \* \*

The bond shall be credited, against the imported metals charged thereon, with the lead contents of the antimonial lead determined by the Government assay of the dip samples, as above provided, plus the wastage allowance, together with any dutiable zinc entirely lost in the smelting or refining, or both, and there shall be credited to the duties charged against the bond an amount, in addition to that paid on the antimonial lead, sufficient to make the total credit equal to the duties assessed against the lead so determined by assay, plus the wastage allowance and the dutiable zinc, if any, entirely lost in smelting or refining, or both, thus balancing the bond.

There is nothing in the language or circumstances surrounding the passage and approval of the Tariff Act of 1922 that leads us to the conclusion that metals lost in the smelting and refining processes in bonded smelters were to be admitted free. It is true that a reasonable allowance must be made by the Secretary of the Treasury for wastage. It is also true that if the zinc content is less than 10 per centum, it is not dutiable. If Congress had intended to make a change in this respect it might easily have done so with few words. General Appraiser Fischer very aptly points out, in the opinion of the court below, that in paragraph 392, the paragraph imposing duties upon lead bearing ores and mattes, this significant exception is made, which did not appear in the equivalent paragraph in the tariff act of October 3, 1913:

*Provided*, That such duty shall not be applied to the lead contained in copper mattes unless actually recovered.

Counsel for appellant suggest here that they presented fully their viewpoint to the congressional committees framing this act. Is it not strange that if Congress had intended to exempt zinc in lead ores from duties, it did not use fit language to accomplish that purpose such as it used relative to copper mattes?

Appellant also insists the zinc in question was not imported, within the meaning of our customs laws, and cites *Marriott* v. *Brune*, 9 How. 619, and other cases, in support of his contention. The cases cited, in each instance, go off upon the principle that merchandise, to be dutiable, must actually arrive in the country; that if it is lost on the voyage, or for other reason is not imported, it is not dutiable. This is conceded law. But no such principle applies here. There can be no controversy that the zinc contained in the imported ores came within the customs jurisdiction of the country. *United States* v. *Shallus*, 2 Ct. Cust. Appls. 332. It was therefore imported, unless some contrary provision of law prevents such con-

struction.   We know of no such provision and must therefore hold the zinc in question was imported.

Finally, it is argued that the zinc in question here was duly destroyed, under the last paragraph of section 537, of said Tariff Act of 1922.   That paragraph is as follows:

> Merchandise entered under bond, under any provision of law, may be destroyed, at the request and at the expense of the consignee, within the bonded period under customs supervision, in lieu of exportation, and the consignee relieved of the payment of duties thereon.

We are not prepared to hold that this language can be applied to the zinc in question.   If appellant had procured the destruction, under this section, of the lead or other refined metal produced by him as the result of his smelting and refining operations, it might, with some reason, be claimed that all duties represented by his bond should be canceled.   But here he does not do this.   Retaining the recoverable product of his operations, he seeks the destruction of the irrecoverable residue and the cancellation, thereby, of a part of his bonded obligation.   We believe that to so hold would be to accomplish by indirection what we have said, herein, we can not do by direction.

For the reasons given the judgment of the court below is *affirmed*.