Slip Op. 13- 7

UNITED STATES COURT OF INTERNATIONAL TRADE

GRK CANADA, LTD.,

    Plaintiff,

     v.         Before: Judith M. Barzilay, Senior Judge

UNITED STATES,        Court No. 09-00390

    Defendant.

## OPINION

[On classification of certain steel screws summary judgment granted for Plaintiff; summary judgment denied for Defendant.]

                      January 14, 2013

Montgomery, McCracken, Walker & Rhoads, LLP (Craig E. Ziegler) for Plaintiff.

Stuart F. Delery, Principal Acting Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jason M. Kenner); and Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection (Beth Brotman), of counsel, for Defendant.

    BARZILAY, Senior Judge:  This case is before the court on cross-motions for summary judgment.  Plaintiff GRK Canada, Ltd. ("GRK"), challenges the decision of Defendant U.S. Customs and Border Protection ("Customs") denying GRK's protest of Custom's classification of its R4 Screws and Trim Head Screws within the Harmonized Tariff Schedule of the United States ("HTSUS").  Customs classified the merchandise as "other wood screws" under subheading 7318.12.00 of the HTSUS, which carries a 12.5% *ad valorem* duty.  Plaintiff claims that the merchandise is properly classified as "self-tapping screws" under subheading 7318.14.10

of the HTSUS, which carries a 6.2% *ad valorem* duty.  The court has jurisdiction pursuant to 28

U.S.C. § 1581(a).  For the reasons set forth below, Plaintiff's motion for summary judgment is

granted and Defendant's motion is denied.

## I. STANDARD OF REVIEW

The court reviews Customs' protest decisions *de novo.* 28 U.S.C. § 2640(a)(1).  USCIT

Rule 56 permits summary judgment when "there is no genuine issue as to any material

fact . . . ." USCIT R. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In considering whether material facts are in dispute, the evidence must be considered in a light

most favorable to the non-moving party, drawing all reasonable inferences in its favor, as well as

all doubts over factual issues. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157

(1970); *Anderson,* 477 U.S. at 253-54.

A classification decision involves two steps.  The first addresses the proper meaning of

the relevant tariff provisions, a question of law.  *See Faus Group, Inc. v. United States,* 581 F.3d

1369, 1371-72 (Fed. Cir. 2009) (citing *Orlando Food Corp. v. United States,* 140 F.3d 1437,

1439 (Fed. Cir. 1998)).  The second step determines the nature of the imported merchandise and

is a question of fact. *See id.*  When there is no factual dispute regarding the merchandise, as is the

case here, the resolution of the classification issue turns on the first step, determining the proper

meaning and scope of the relevant tariff provisions. *See Carl Zeiss, Inc. v. United States,* 195

F.3d 1375, 1378 (Fed. Cir. 1999); *Bausch & Lomb, Inc. v. United States,* 148 F.3d 1363, 1365-66

(Fed. Cir. 1998).

While the court accords deference to Customs' classification rulings relative to their

"power to persuade," *United States v. Mead Corp.,* 533 U.S. 218, 235 (2001) (citing *Skidmore v.*

*Swift & Co.,* 323 U.S. 134, 140 (1944)), the court has "an independent responsibility to decide

the legal issue of the proper meaning and scope of HTSUS terms." *Warner-Lambert Co. v.*

*United States,* 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United*

*States,* 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

## II. UNDISPUTED FACTS

The following facts are not in dispute.  GRK imports steel screws into the United States.

There are two styles of screws at issue in this case: (1) GRK model R4 Screws and (2) GRK

model Trim Head Screws.  There are two variations of Trim Head Screws: (1) RT Composite

Trim Head Screws and (2) Fin/Trim Head Screws.  GRK entered the subject screws between

January 2008 and August 2008.  The screws are made of corrosion resistant case hardened steel,

have heads, shanks, threads, points, and are of various lengths and diameters.

The head of a screw is the end that resembles a mushroom top and allows it to be turned

or driven into the target material.  After being fastened the head normally comes to rest along the

surface of the material to which it is fastened.  The cylindrical portion of the screw from the

underside of the head to the tip is known as the shank.  It can be fully or partially threaded.  The

threaded portion of a screw can be recognized as the male part of the screw with spiraling metal

threads that create female threads in the target material.  The tip of a screw (also called the point)

is the part that first enters the target material.

GRK's R4 screws (of all sizes) have a flat self-countersinking head with saw-blade-like

cutting teeth and six self-contained cutting pockets on the underside of the head.  This design

eliminates the need to perform a separate countersinking operation because the underside of the

head cuts away the top layer of material as the screw is driven into place.  R4 screws with a

length of 1¼ inches and longer have a patented thread design GRK refers to as "W-Cut" threading.  It is located near the tip, along the threaded portion of the screw.  R4 screws with a length of 2 inches and longer have a secondary area of threading GRK refers to as "CEE" threading.  It is located closer to the head, directly underneath the unthreaded part of the shank. R4 screws without "CEE" threading simply have a partially unthreaded shank.  The "W-Cut" threading acts like a saw blade and cuts through the material as the screw is being driven into place, while the "CEE" threading enlarges the screw hole to allow the two materials being fastened together to settle easily around the non-threaded portion of the screw.

GRK's Trim Head Screws have much smaller heads (the smallest available) that are designed to prevent the screws from cracking and splitting the target material.  Trim Head Screws with a length of 1¼ inches and longer have "W-Cut" threading.  GRK's RT Composite Trim Head Screws (a variation of the Trim Head Screw) have a second set of threads near the head, underneath the unthreaded shank, called reverse threading.  Reverse threading allows the head of the screw to be less noticeable along the surface of the target material.  GRK's Fin/Trim Head Screws (the other type of Trim Head Screw) do not have reverse threading and simply have a partially unthreaded shank.

Both GRK models (R4 and Trim Head screws) have gimlet points, which is a type of tip characterized by a sharp threaded point.  GRK's screws have point angles between 25 and 35 degrees.  In addition to having gimlet points, R4 screws of 1¼ inches and longer have a feature called a Type 17 point that GRK refers to commercially as a "Zip-Tip."  Trim Head Screws of all sizes have Type 17 points.  A Type 17 point is a gimlet point with a slot or groove with sharp edges cut into it.  It allows the screw's insertion into the material to start more easily by giving

the point an additional cutting edge, thereby reducing the torque needed to drive the screw into place. A Type 17 point cuts and removes material as it is being turned into the target material.

Both models are manufactured to meet certain minimum torsional strength requirements. Torsional requirements measure the ability of a screw to resist torque forces that cause it to twist off course as it is being driven into the material. The subject screws are available in carbon steel and stainless steel. The carbon steel versions are made of heat-treated, case-hardened steel. The stainless steel versions have been hardened through a process called draw hardening.

The subject screws can be used in wood, sheet metal, plastics, medium-density fiberboard, polyvinyl chloride (PVC) board, cement fiberboard, melamine, arborite, and other man-made composite materials. More specifically, GRK's R4 Screws are recommended for use in wood, particle board, plastic, sheet metal, cement fiber board and wood decking, pressure treated lumber decking, cedar and redwood decking. GRK's Trim Head Screws are recommended for most fine carpentry applications and trim applications, and can be used to anchor composite decking material to wood beams.

### III. DISCUSSION

The "General Rules of Interpretation ("GRIs") govern classification of merchandise under the HTSUS, and are applied in numerical order." *Honda of America Mfg. v. United States*, 607 F.3d 771, 773 (Fed. Cir. 2010) (internal quotations and citations omitted). "What is clear from the legislative history of the World Customs Organization ("WCO") and case law is that GRI 1 is paramount." *Telebrands Corp. v. United States*, 36 CIT __, __, 865 F. Supp. 2d 1277, 1280 (2012). When determining the correct classification for merchandise, a court first construes the language of the headings in question, in light of any related section or chapter notes.

*See* GRI 1; *Faus Grp., Inc. v. United States*, 581 F.3d 1369, 1372 (Fed. Cir. 2009) (citing

*Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998)).[1]  The "terms of the

HTSUS are construed according to their common commercial meanings." *Millenium Lumber*

*Distrib. Ltd. v. United States*, 558 F.3d 1326, 1329 (Fed. Cir. 2009).  To ascertain the common

commercial meaning of a tariff term, the court "may rely on its own understanding of the term as

well as lexicographic and scientific authorities." *Len-Ron Mfg. Co. v. United States,* 334 F.3d

1304, 1309 (Fed. Cir. 2003).  The court may also refer to the Harmonized Description and

Coding System's Explanatory Notes ("Explanatory Notes") "accompanying a tariff subheading,

which - although not controlling - provide interpretive guidance." *E.T. Horn Co. v. United*

*States,* 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing *Len-Ron,* 334 F.3d at 1309).

There is no dispute that GRK"s screws are covered by HTSUS Heading 7318, which

provides for "*screws*, bolts, nuts, coach screws, screw hooks, rivets, cotters, cotter pins,

washers . . . and similar articles, of iron or steel." HTSUS Heading 7318 (emphasis added).  The

dispute concerns the proper HTSUS subheading for GRK's screws:

Threaded articles:
. . .

7318.12.00 Other wood screws. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12.5%
. . .

7318.14 Self-tapping screws:

      7318.14.10 Having shanks or threads with a diameter of

---

[1] This case involves the interpretation of the HTSUS subheadings, which requires application of GRI 6, which prescribes the same methodology set forth in GRI 1 and provides that classification "shall be determined according to the terms of those subheadings and any related subheading notes," including "the relative section, chapter and subchapter notes." GRI 6.

less than 6 mm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6.2%

*Id.* The subheadings are *eo nomine* provisions, or more simply, provisions "that describe[] an article by a specific name, not by use." *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (citing *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011)) (emphasis added). Absent limiting language or contrary legislative intent, an *eo nomine* provision covers all forms of the named article. *Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995). *Eo nomine* provisions are different from use provisions. A use provision classifies an article by its principal or actual use. *See Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1363 (Fed. Cir. 1999). The interpretation of use provisions is guided by the HTSUS Additional U.S. Rules of Interpretation ("ARI"). *See* ARI 1(a)-(b).

This is a challenging case. The HTSUS does not specifically define the terms "other wood screws" or "self-tapping screws." GRK argues that the terms should be defined (and distinguished) by the physical characteristics of wood and self-tapping screws. Pl. Supplemental Resp. Br. 2-4, 19. According to GRK, the subject screws are self-tapping screws—with case hardened steel, minimum torsional strength requirements, and no need for a tapping operation[2]—thereby mandating classification under subheading 7318.14.10 (self-tapping screws). Pl. Br. 13-

---

[2] A tap is defined as "a tool for forming an internal screw thread (as in a nut) consisting of a hardened tool-steel male screw grooved longitudinally so as to have cutting edges." Webster's Third New International Dictionary 2339 (1993). A tapping operation involves using a tapping tool to create female threads in the target material. Before performing a tapping operation, though, one must drill or punch a pilot hole. Generally speaking, tapping screws are capable of cutting or forming their own threads without the use of a tap but to do so they first require a separate operation to create a pilot hole. *See* Industrial Fasteners Institute Pamphlet, "An Introduction to Tapping Screws" Docket Entry No. 44 Ex. A at 0060 (explaining functionality of tapping screws) ("IFI Pamphlet").

20.  GRK observes that "[a] self-tapping screw is essentially an enhanced wood screw -- a wood screw on steroids, if you will -- that offers performance capabilities that a mere wood screw simply cannot provide.  But the fact that a self-tapping screw has these enhanced capabilities, to penetrate sheet metal, plastics, marble, slate, etc., does not preclude that self-tapping screw from also being used in wood, where its enhanced capabilities are not needed and are mere surplusage."  Pl. Resp. Br. 13.

The Government, on the other hand, argues that the terms should not be defined by their physical characteristics alone, but also by the materials in which they are used. Def. Br. 13-20.  According to the Government, "the common meaning of 'wood screws' are those primarily intended to be used in wood or other resilient materials (such as wood composite materials), while the common meaning of 'self-tapping screws' are those primarily intended to be used in materials like steel, concrete, and marble." Def. Supplemental Response Br. 4 (emphasis added).  The Government argues that GRK's screws are designed primarily for use in wood applications, not metal, and that this critical factor mandates classification under subheading 7318.12.00 (other wood screws).  Note that the Government's argument depends heavily on use even though there is no dispute that the subheadings in question are *eo nomine* provisions.  This is a weakness that ultimately undermines the Government's proposed classification.

### A. Scope of Subheading 7318.12.00 (Other woods screws)

As noted above, the HTSUS does not specifically define the term "other wood screws."  Turning to lexicographic sources, Webster's Third New International Dictionary defines a "wood screw" as a "pointed metal screw formed with a sharp thread of comparatively coarse pitch for insertion in wood." Webster's Third New Int'l Dictionary 2631 (1993).  The Oxford English

dictionary defines a "wood screw" as designating a "metallic screw specially adapted for fastening together parts of woodwork or wood and metal." The Oxford English Dictionary 504 (2d. ed. 1989).  The McGraw-Hill Dictionary of Scientific and Technical Terms defines a "wood screw" as "[a] threaded fastener with a pointed shank, a slotted or recessed head, and sharp tapered thread of relatively coarse pitch for use only in wood." McGraw-Hill Dictionary of Scientific and Technical Terms 2302 (6th ed. 2003).  The Academic Press Dictionary of Science and Technology defines a "wood screw" as "a metal fastener used for wood, usually having a flat, slotted head, a pointed shank, and a coarse thread." Academic Press Dictionary of Science and Technology 2378 (1992).

The Explanatory Notes to HTSUS Heading 7318 provide some additional interpretive guidance for the term "wood screws" that is consistent with the aforementioned dictionary definitions:

> Screws for wood differ from bolts and screws for metal in that they are tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material. Further, wood screws almost always have slotted or recessed heads and they are never used with nuts.

Explanatory Notes for HTSUS Heading 73.18.

The industry standards for mechanical fasteners provide further guidance.  They are published by the American National Standards Institute/American Society of Mechanical Engineers (ANSI/ASME) and provide dimensional characteristics and mechanical requirements

for various types of fasteners. *See* Initial Expert Report of Dr. David R. Bohnhoff[3] at 5-6 (Jan. 13, 2011). Standard B.18.12 (Glossary of Terms for Mechanical Fasteners) defines a wood screw as "a thread forming screw having a slotted or recessed head, gimlet point, and a sharp crested, coarse pitch thread, and generally available with flat, oval, and round head styles. It is designed to produce a mating thread when assembled into wood or other resilient materials." ANSI/ASME Standard B.18.12 ¶ 3.1.2.30 (2001). Standard B.18.6.1 (Wood Screws), which covers general and dimensional data, notes that wood screws "shall have coarse pitch spaced threads and a gimlet point. The threads may be either cut or rolled . . . . The length of the thread on wood screws having cut threads shall be equivalent to approximately two-thirds of the nominal length of the screw. . . . Rolled thread wood screws shall have a length of thread equivalent to at least four times the basic screw diameter or two-thirds of the nominal screw length, whichever is greater. . . . Wood screws shall be supplied in steel, corrosion resistant steel, brass, aluminum alloy, or other materials as designated by the purchaser. Unless otherwise specified, no chemical or physical requirements shall apply. Screws may be heat treated at the option of the purchaser or the manufacturer to develop adequate torsional strength for the intended application. . . . Unless otherwise specified, wood screws shall be supplied with a natural (as processed) finish, unplated or uncoated." ANSI/ASME Standard B.18.6.1 ¶¶ 2.3-2.7 (1981).

GRK urges the court to limit the HTSUS definition of "wood screws" to the industry standards (Glossary of Terms) definition of a "standard wood screw," which has (1) a flat, oval,

---

[3] Dr. David R. Bohnhoff, Ph.D, P.E., is Plaintiff's expert witness. He is a full professor in the Biological Systems Engineering Department at the University of Wisconsin-Madison. *See* Bohnhoff Deposition at 42-49 (May 18, 2011).

or round head, (2) sharp crested, coarse pitch threads, and (3) a sharp gimlet point.[4] Pl. Br. 10-15. An *eo nomine* provision, however, such as "other wood screws," "'include[s] all forms of the named article[,]' even improved forms." *CamelBak Prods, LLC v. United States*, 649 F.3d 1361, 1365 (Fed. Cir. 2011) (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed.Cir.1999) ("*Carl Zeiss*")). Modern wood screws have evolved from the original, standard wood screw. *See* Greenslade Deposition at 104-06. The first departure from the standard wood screw design was the conventional drywall screw or twinfast wood screw. *See id.* It introduced sharper point angles and case hardening into the standard wood screw model. *See id.* More recent innovations in wood and drywall screws are built on the twinfast design. *See id.* Accordingly, the subheading for "other wood screws" covers more than standard wood screws; it also covers various modified wood screws. Putting all of the aforementioned together (dictionary definitions, explanatory notes, and evolving industry standards) for a workable definition within the HTSUS, "other wood screws" can be defined as having (1) a flat, recessed, oval, round, or slotted head, (2) partially unthreaded shank, (3) coarse pitch spaced threads, and (4) a sharp gimlet point, and may also have (5) potential modifications to these criteria (such as sharper point angles or case hardening) so long as the modified screw retains an essential resemblance to a standard wood screw.[5]

---

[4] ANSI/ASME Standard B. 18.6.1 specifies that, for wood screws, the length of the threading is almost invariably two-thirds of the total length of the screw. Except for screws of very short overall length, almost all wood screws will be threaded for approximately two-thirds of their length. *See* Greenslade Desposition at 111-15. Thus, a partially unthreaded shank is also a feature of standard wood screws.

[5] The court notes that the simple observation that a wood screw is any screw used in wood is not correct in this context. Absent any standard, "the layperson would define a wood screw as any

## B. Scope of Subheading 7318.14.10 (Self-tapping screws)

As noted above, the HTSUS does not specifically define the term, "self-tapping screws." Turning to lexicographic sources, Webster's Third New International Dictionary does not have an entry for "self-tapping screws" but defines "tapping screws" as a "hardened screw that cuts threads in the piece it secures and that is used in materials which would otherwise require a separate tapping operation or the use of a nut." Webster's Third New Int'l Dictionary 2340 (1993). The Oxford English dictionary defines "self-tapping" as a "hardened screw that will cut its own thread in a hole in metal that would otherwise need tapping." The Oxford English Dictionary 932 (2d. ed. 1989). Additionally, there is subtext under the definition that states "[s]elf-tapping screws are screws that may be driven into an untapped hole, forming the thread in the hole as they are driven. . . . From the point of view of large-scale production of sheet metal components, the great design change has been brought about by the Parker-Kalon or self-tapping screw." *Id.* The McGraw-Hill Dictionary of Scientific and Technical Terms defines "self-tapping screws" as having a "specially hardened thread that makes it possible for the screw to form its own internal thread in sheet metal and soft materials when driven into a hole that has been drilled, punched, or punched and reamed. The McGraw-Hill Dictionary of Scientific and Technical Terms 1893 (6th ed. 2003). The Academic Press Dictionary of Science and Technology defines a "self-tapping screw" as a "specially hardened screw used in wood and soft

---

screw used in wood. Such a definition is unworkable for tariff purposes as the true end use of virtually all fasteners can never be determined with any degree of certainty." Initial Expert Report of Dr. David R. Bohnhoff at 14; *see also* Bohnhoff Response to Greenslade Report at 9 (Apr. 3, 2011). The term "wood screw" refers to a specific type of fastener recognized within the industry by certain design features.

metals that self-cuts its own thread into the material being worked on. Also, TAPPING SCREW,

SHEET METAL SCREW." Academic Press Dictionary of Science and Technology 1951 (1992).

The Explanatory Notes to HTSUS Heading 7318 provide some additional interpretive

guidance for the term "self-tapping":

> The heading includes self-tapping (Parker) screws; these resemble wood screws in
> that they have a slotted head and a cutting thread and are pointed or tapered at the
> end. They can therefore cut their own passage into thin sheets of metal, marble,
> slate, plastics, etc.

Explanatory Notes for Heading 73.18.  The reference to "Parker" provides a helpful clue about

the original scope of subheading 7318.14.10 (self-tapping screws).  Parker-Kalon Corporation

was one of the first screw manufacturers to develop and market self-tapping screws, also known

as sheet metal screws. *See* Greenslade Deposition[6] at 102-103; Smithsonian Institution, Trade

Catalogs from Parker-Kalon Corp. ("Since developing the world's first self-tapping screw in

1913, Parker-Kalon® has become a leading manufacturer of engineered threaded fasteners aka

specialty screws for industrial, construction and automotive use; these include self-tapping, sheet

metal, self-drilling & drive screws . . . .") *available at*

http://collections.si.edu/search/results.htm?q=record_ID:SILNMAHTL_28740 (last visited Jan.

14, 2013).  As noted, sheet metal screws are sometimes referred to as Parker screws (PK

---

[6] Joe Greenslade ("Greensalde") is the Government's expert witness. He is Director of
Engineering Technology of the Industrial Fasteners Institute (IFI).  He is also a member of the
fastener committees of the American Society of Material and Testing (ASTM F16), SAE
International, USA Delegate to the International Organization of Standard (ISO TC2), and the
American Society of Mechanical Engineers (ASME B18), for which he is the current Chairman.
*See* Declaration of Joe Greenslade, Def. Ex. I part 1, Docket Entry No. 29 (Oct. 13, 2012).

screws).[7]  In other words, the three terms—sheet metal screws, Parker screws, and self-tapping

screws—have been used interchangeably within the industry to describe the same type of screw.

The Explanatory Notes go on to mention other materials through which self-tapping screws can

cut their own passage (tap their own threads), which broadens the scope of the subheading

beyond self-tapping, sheet metal screws.

The ANSI/ASME industry standards provide guidance on the characteristics of tapping

screws.  Standard B.18.12 (Glossary of Terms for Mechanical Fasteners) defines a tapping screw

as having a "slotted, recessed, or wrenching head and is designed to form or cut a mating thread

in one or more of the parts to be assembled.  Tapping screws are generally available in various

---

[7]  *See, e.g.*, DatWiki, Parker-Kalon Screw ("The registered trade name for a self-tapping sheet
metal screw, often called a PK screw. Parker-Kalon screws, made of hardened steel and having
sharp, coarse threads, are used to hold thin sheets of metal together. As the screw is turned
through matching holes in the thin metal, the threads clamp the sheets tightly together.")
*available at* http://www.datwiki.net/page.php?id=5838&find=Parker-
Kalon%20screw&searching=yes (last visited Jan. 14, 2013); DatWiki, Self-Tapping Screw ("A
type of screw with sharp threads that cut their own matching threads when screwed into soft
metal, wood, or plastic. Self-tapping screws are especially suited for holding together sheets of
thin metal, and for this reason, they are often called sheet-metal screws, or PK screws, after
Parker-Kalon, one of their major manufacturers.") *available at*
http://www.datwiki.net/page.php?id=7025&find=self-tapping screw&searching=yes (last visited
Jan. 14, 2013); Orbital fasteners, Self-Tapping Screws ("Self tapping screws are often referred to
as self tappers or PK's as many of them were originally manufactured by the Parker-Kalon
company. In America they are known as sheet metal screws as they are for use in sheet metal . . .
.") *available at* http://www.orbitalfasteners.co.uk/en/categories/self-tapping-screws (last visited
Jan. 14, 2013); Alma Bolt Company & Prime Fasteners, Self-Tapping Screws ("Also know[n] as
. . . Sheet Metal Screws, . . .") *available at* http://www.almabolt.com/pages/catalog/screws/self-
tapping.htm; Fastener Superstore, Self-Tapping Screws ("Self-Tapping Screws, also called Sheet
Metal Screws, tap their own mating thread in pre-drilled holes.") *available at*
http://www.fastenersuperstore.com/screws/Self_Tapping-Screws (last visited Jan. 14, 2013);
Hudson Fasteners, Sheet Metal & Self-Tapping Screws (offering different styles of self-tapping,
sheet metal screws) *available at* http://www.hudsonfasteners.com/sheet.htm (last visited Jan. 14,
2013).

combinations of the following head and screw styles: fillister, flat, flat trim, hexagon, hexagon washer, oval, oval trim, pan, round, and truss head styles with thread-forming screws, Types A, B, BA, BP, and C, or thread cutting screws, Types D, F, G, T, BF, BG, and BT. . . .” ANSI/ASME Standard B.18.12 ¶ 3.1.2.22 (2001).  The Glossary of Terms also defines a gimlet point as “a threaded cone point usually having a point angle of 45 to 50 deg.  It is used on thread forming screws such as Type AB tapping screw, wood screws, lag bolts, etc.” *Id.* ¶ 2.2.12.3. Standard B.18.6.4 (Thread Forming and Thread Cutting Tapping Screws and Metallic Drive Screws), which covers general and dimensional data, states that “[t]hread forming tapping screws are generally for application in materials where large internal stresses are permissible, or desirable, to increase resistance to loosening.” ANSI/ASME Standard B.18.6.4 ¶ 1.3.1 (1998). Alternatively, “[t]hread cutting tapping screws are generally for application in materials where disruptive internal stresses are undesirable or where excessive driving torques are encountered with thread forming screws.” *Id.* ¶ 1.3.2.  “Tapping screws are normally fabricated from carbon steel of high quality, case hardened to meet the performance requirements set forth in these specifications.” *Id.* ¶ 2.6.1  “Where so specified, tapping screws may also be made from corrosion resistant steel, brass, monel, and aluminum alloys.” *Id.* ¶ 2.6.2.  “Unless otherwise specified, tapping screws shall be supplied with a natural (as processed) finish, unplated or uncoated.  Where corrosion preventative treatment is required, screws shall be plated or coated as agreed upon between the manufacturer and the purchaser.” *Id.* ¶ 2.7.  Tapping screws must

also satisfy performance requirements, such as a drive test and a torsional strength test. *See id.*¶

2.9.[8]

For whatever reason the industry standards do not mention "self-tapping" screws.

Plaintiff contends the two terms are used interchangeably and that the HTSUS "self-tapping"

nomenclature is a "distinction without a difference." Pl. Supplemental Resp. Br. 5. Customs, on

the other hand, claims that the term "self-tapping screws" under the HTSUS is different from the

term "tapping screws" under the ANSI/ASME industry standards. Def's Supplemental Br. 6.

More specifically, Customs argues:

> [T]he terms "tapping" and "self-tapping" generally describe the same functionality – creating one's own threads. But, the term "self-tapping" in the HTSUS provision for "Self-tapping screws" is limited to screws intended to create their own threads in non-wood applications such as metal and concrete. *See Explanatory Note* 7318. We know that "self-tapping" within the tariff must mean something other than a general description of the functionality of creating one's own threads because assuming the terms "tapping" and "self-tapping" were synonymous for tariff purposes, renders the term "self-tapping" surplusage, as screws described by the competing subheading of "Other wood screws" also create their own threads.
>
> . . .
>
> Rather, the scope of the tariff provision for self-tapping screws covers those screws primarily designed to create their own threads in materials such as metal, concrete, masonry etc. The relevant ENs explain that "this heading includes self-tapping (parker) screws; these resemble wood screws in that they have a slotted head and a cutting thread and are pointed or tapered at the end. They can therefore

---

[8] Although there are certain types of tapping screws that can drill their own pilot holes, cut their own threads, and fasten all in one operation, they are referred to as self-drilling screws, not self-tapping screws. *See* Supplemental Expert Report of Dr. David R. Bohnhoff, PhD., P.E. at 1, 4 (Apr. 3, 2011) ("Self-tapping screws should not be confused with self-drilling. Self-tapping is the cutting of female threads."); *see also* Eagle Fastener Corporation, Screws (illustrating different types of screws) *available at* http://www.eaglefastener.net/fasteners/screws.html (last visited Jan. 14, 2013).

> cut their own passage into thin sheets of [sic] marble, slate, plastics, etc." Further, as stated in *David Komisar*, "metal screws, machine screws, or tapping screws, the terms being synonymous, are fully threaded. A machine screw will make its own threads in metal . . . ." *David Komisar* 88 Cust. Ct at 89. As such, it cannot be reasonably disputed that the tariff term "self-tapping screws" encompasses screws designed primarily for metal, concrete, marble etc. applications. And while this term would certainly encompass and sprang from sheet metal screws which are designed to anchor a thin sheet of metal to another sheet of metal (*see, e.g.*, Exhibit 1), based upon the ENs the term is not only limited to sheet metal screws, but can encompass screws for concrete, marble, *etc*.

Def. Supplemental Resp. Br. 6-7.  Customs believes the Explanatory Notes define self-tapping

screws by their use in metal and other "non-wood" applications, which creates a distinction

between "self-tapping screws" as defined in the HTSUS, and "tapping screws" as defined by

industry standards, which do not have such a limitation.  The court, though, is not persuaded.

The Explanatory Notes describe the physical characteristics of self-tapping screws, which

resemble wood screws, but add case hardening and the ability to tap their own threads as

distinguishing characteristics. Explanatory Notes at XV-7318-2.  The statement at the end, listing

the materials in which they can "cut their own passage into thin sheets of metal, marble, slate,

plastics, etc." does not manifest a clear direction to limit "self-tapping" screws to the types of

materials in which they are used. *Id.*  It merely provides a non-exhaustive list of various

materials into which self-tapping screws cut their own passage.  The court cannot join Customs

in reading this list as some form of delimiter for self-tapping screws, especially if that delimiter

is a use limitation on an otherwise *eo nomine* provision.  *See Carl Zeiss*, 195 F.3d at 1379 ("[A]

use limitation should not be read into an *eo nomine* provision unless the name itself inherently

suggests a type of use.").

The court does not share Customs' interpretation of the Explanatory Notes as defining "self-tapping screws" based on the materials in which the screws are used. The court is mindful that, as with the subheading for "other wood screws," an *eo nomine* provision includes "improved forms." *CamelBak Prods, LLC*, 649 F.3d at 1365. The subheading for self-tapping screws is not limited to the original Parker-Kalon (sheet metal) screws that gave birth to the subheading; it also includes the larger family of tapping screws that have since evolved from sheet metal screws. *See* United States International Trade Commission Ruling and Harmonized Tariff Schedule, Rulings by Tariff Numbers – 7318.14.10 (listing Customs HQ Rulings classifying deck screws, steel framing screws, drywall screws, zinc-plated decking screws, roofing screws, among others, as self-tapping screws under subheading 7318.14.10), *available at* http://www.faqs.org/rulings/tariffs/73181410.html (last visited Jan. 14, 2013); IFI Pamphlet, Docket Entry No. 44 Ex. A at 0060-61 (explaining evolution of tapping screws) ("IFI Pamphlet").

Putting the aforementioned together to ascertain a workable definition (not relying on use), "self-tapping screws" can be defined under the HTSUS as being a specially hardened screw that can cut or form its own threads in the substrate without a separate tapping operation. More specifically, self-tapping screws (1) are made of case hardened steel, (2) have passed certain performance requirements, and (3) do not require a separate tapping operation.[9]

---

[9] Though many tapping screws are fully threaded, Greenslade Deposition at 122, that characteristic is not mentioned in the Explanatory Notes, dictionary definitions, or industry standards, and is therefore not a necessary criterion. Head style is also not a necessary criterion because although the Explanatory Notes only mention slotted heads, the ANSI/ASME industry standards mention slotted, recessed, wrenching heads, among others. *See* Standard B.18.12 ¶ 3.1.2.22; *see also* IFI Pamphlet at 0060 ("There is an almost unlimited variety of combinations of

### C. Defining the Subheadings on the Basis of Use

The main thrust of the Government's classification argument depends upon use, both in interpreting the two subheadings ("other wood screws" and "self-tapping screws"), and in classifying the subject merchandise. According to the Government, "the common meaning of 'wood screws' are those primarily intended to be used in wood or other resilient materials (such as wood composite materials), while the common meaning of 'self-tapping screws' are those primarily intended to be used in materials like steel, concrete, and marble." Def. Supplemental Resp. Br. 4. The Government argues that GRK's screws are designed primarily for use in wood applications, not metal, and that this critical factor mandates classification under subheading 7318.12.00 (other wood screws).

To advance its "use" arguments, Customs relies on cases under the predecessor Tariff Schedules of the United States ("TSUS"), to support an interpretation that distinguishes between wood and self-tapping screws based on whether they are used for wood or metal applications. Def. Supplemental Resp. Br. 3-6 (citing *Trans-Atlantic Co. v. United States*, 68 Cust. Ct. 105, 108 (1972) ("*Trans-Atlantic*") ("The use of an article provided for *eo nomine* has ofttimes been considered an important factor in determining the proper tariff classification."); *David Komisar & Son, Inc. v. United States*, 77 Cust. Ct. 88 (1976); *United States v. Quon Quon Co.*, 46 CCPA 70, 72-74 (1959) ("*Quon Quon*") ("Of all things most likely to help in the determination of the identity of a manufactured article, beyond the appearance factors of size, shape, construction and the like, use is of paramount importance."). In each of the TSUS cases cited by the Government,

sizes, thread types, head styles, drive mechanisms and performance capacities to choose from . . . .").

the court determined that it was not precluded from considering use even though it was interpreting *eo nomine* provisions.[10]

However, the "HTSUS supplanted the Tariff Schedules of the United States (TSUS) in 1989. . . . The HTSUS is actually quite different from the TSUS.  The HTSUS is a system of nomenclature organized in a hierarchical structure and has far greater specificity, continuity, and completeness than the TSUS.  Cases decided under the TSUS may be instructive, but they do not bind courts interpreting the HTSUS." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13343 (2d ed. 2012) ("Fed. Forms § 13343").

The court cannot support this instance of reading use into an *eo nomine* tariff provision under the HTSUS.  *See Carl Zeiss*, 195 F.3d at 1379 ("[A] use limitation should not be read into an *eo nomine* provision unless the name itself inherently suggests a type of use."); *see also Aromont USA, Inc.*, 671 F.3d at 1312 ("The soups and broths portion of this heading is an *eo nomine* provision, that is, a provision that describes an article by a specific name, not by use."). Obviously, a use provision implicates a different analytical framework than does an *eo nomine* provision. *See Primal Lite, Inc.*, 182 F.3d at 1363.

---

[10] Government also cites three CIT decisions from the 1990s, *Nestle Refrigerated Food Co. v. United States*, 18 CIT 661 (1994); *H.J. Stotter, Inc. v. United States*, 18 CIT 696, 858 F. Supp. 236 (1994); *Mark D. Myers v. United States*, 21 CIT 654 (1997). Def. Br. 16.  These cases are not persuasive. As for *Nestle*, the Federal Circuit explained the court had misapplied the HTSUS. *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998).  Likewise in *H.J. Stotter*, the court was operating with an incorrect standard of review by applying the presumption of correctness within the context of cross motions for summary judgment, concluding that plaintiff had "overcome the presumption of correctness" for the legal question of the proper interpretation of the tariff terms in issue. See *Universal Electronics*, which explains the proper application of the presumption of correctness. *See Universal Elects. Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997).  In *Myers*, the court rejected the notion that an *eo nomine* provision may be governed by use.

The TSUS cases cited by the government fail to adequately explain the potential problem

of inadvertently converting an *eo nomine* provision into a use provision.  For example, in *Trans-*

*Atlantic*, a case decided in 1972, the court was faced with an issue similar to the one presented

here.  The court reasoned:

> . . . the issue therefore revolves about the extent of the common meaning,
> i.e., does it refer to a physically distinct type of screw, having only two-thirds of
> its shank threaded or does it embrace any kind of screw which is primarily used in
> wood?
>        We are of the opinion that the latter controls notwithstanding the fact that
> the statute provides *eo nomine* for wood screws. The use of an article provided for
> *eo nomine* has ofttimes been considered an important factor in determining the
> proper tariff classification. *United States v. Quon Quon Company*, 46 CCPA 70,
> C.A.D. 699 (1959). The intent of Congress in enacting the language "Screws,
> commonly called wood screws" from the Tariff Act of 1897 to the Tariff Act of
> 1930 clearly indicates the term to mean screws intended for use in wood. The
> Summaries of Tariff Information, 1920, 1921, 1929; Dictionary of Tariff
> Information, 1924. The dictionary definitions set forth in the case of *United States
> v. Astra Bentwood Furniture Co.*, 25 CCPA 340, T.D. 49434 (1938), and the
> present day dictionaries such as Funk & Wagnalls Standard Dictionary,
> international edition (1963), p. 1449, and Webster's Third New International
> Dictionary, unabridged (1961), p. 2631, confirm the fact that wood screws are
> intended for use in wood.

*Trans-Atlantic*, 68 Cust. Ct. at 108.  The *Trans-Atlantic* court apparently construed the TSUS

tariff term for wood screws as some sort of use provision, effectively converting an *eo nomine*

provision into a use provision because it better captured the common and commercial meaning of

the term.  Here, the court cannot adopt the same approach, especially when operating under the

HTSUS, which has far greater specificity, continuity, and completeness than the TSUS. *See* Fed.

Forms § 13343.  The court will not convert an *eo nomine* provision into a use provision based on

the Government's arguments in this case.  The court must instead operate from the premise that

the HTSUS provisions here are *eo nomine* and do not implicate a use analysis.  The court will

focus not on use, and instead design characteristics, as Customs itself did for many years. *See,*

*e.g.*, HQ Ruling 967919 (Jan. 24, 2006).

### D. Classification of the Subject Merchandise

GRK's screws are not your standard wood or self-tapping screws. They are modified

screws that have features of both self-tapping and wood screws. For example, GRK's screws

have several characteristics of self-tapping screws. They are (1) made of heat-treated, case

hardened steel, (2) manufactured to meet certain minimum torsional strength requirements, and

(3) capable of cutting their own mating threads without a separate tapping operation. Moreover,

GRK's screws have additional features (i.e., Type 17 Point, W-Cut Threading, etc.) that permit

them to create their own pilot hole, tap their own threads, and some even perform a self-

countersinking operation. GRK's screws, therefore, possess the defining characteristics of "self-

tapping screws."

GRK's screws also have the general characteristics of "other wood screws." They have

(1) flat recessed heads (R4 models), (2) coarse pitch spaced threads, (3) partially unthreaded

shank, and (4) a sharp gimlet point. GRK's screws have additional features similar to the

modified features of "other wood screws." They are case hardened. They also have Type 17

points and W-Cut Threading.[11] These added features eliminate the need for predrilling (in

---

[11] Customs' treatment of the Type 17 Point illustrates the agency's evolving view concerning certain features of GRK's screws. Prior to 2010, Customs classified screws with a Type 17 Point under subheading 7318.14.10 (self-tapping screws). *See* HQ Ruling 967919 ("Auger and double auger points, on the other hand, are not listed in the identified standards either for wood screws or tapping screws. This is a point type modified by cutting a slot into the tip of the fastener to allow for the displacement of material and to reduce the cracking or splitting of the material as the screw is driven. Screws with this modified design feature function in a manner similar to

certain materials) and allow the screws to cut away material in a saw-like fashion, thereby

reducing the amount of torque required to install the screw. Def. Br. Ex. F part 1 at 0117 (GRK's

product guide).  GRK's R4 screws (2 inches and longer) have what is called CEE threading.

This feature improves upon standard wood screws by enlarging "the screw hole for the non-

threaded portion of the fastener, allowing the wood to settle easily.  It increases the screw's

drawing strength and reduces the friction on the screw shank that lowers the driving torque." *Id.*

at 0119.  Similarly, GRK's RT Composite Trim Head screws have reverse threading, which

"helps the screw head disappear beneath the surface of the classic wood composite material,

reducing or eliminating the dimple that sometimes appears when using the FIN/Trim screw." *Id.*

Ex. F part 2 at 0141.

GRK's R4 screws improve upon the standard flat recessed head and also have saw-blade-

like cutting teeth and self-contained cutting pockets on the underside of the head that allows

---

self-drilling screws and are often used to mate dissimilar materials. This is not a typical wood screw application.  In addition, auger points have a strong resemblance to the BT Type (flute) point identified in tapping screw specification ASTM/ASME B18.6.4."); NY Ruling G85347 (Dec. 18, 2000) ("You have described your submitted samples as 18-8 stainless steel deck screws with each having a bugle head and a type 17 cutting point. . . . The applicable subheading for all of the deck screws will be 7318.14.1030 . . . .").

Then, in 2010, Customs issued an informed compliance publication that instructed the trade community to classify screws with Type 17 Points under subheading 7318.12 (other wood screws). *See* CBP Informed Compliance Publication, What Every Member of the Trade Community Should Know About: Fasteners of Heading 7318 (Feb. 2010) ("Wood screws are generally tapered and will always have a gimlet point and steep cutting threads.  There are times that the gimlet point will have a single slot cut partially through the point.  This is known as a Type 17 point. . . . The gimlet point may also have saw type threading.").  Apparently, this change in policy may have resulted from communications between a Customs official and Joe Greenslade. *See* Greenslade Deposition at 167-170.  According to Greenslade, the Type 17 Point is a feature of screws designed for application in wood and wood substitutes. Customs has adopted that view.

them to bore away the target material and sit flush against the surface. This eliminates the need for a separate countersinking operation. *See id.* part 1 at 0119. GRK's Trim Head screws have heads that do not resemble standard wood screws. They are very small and resemble a finishing nail. This head is designed to sit flat or just under the surface of the top layer of material (virtually unnoticeable) and prevent splitting in trim applications, much like a finishing nail. *See* Def. Br. Ex. F part 2 at 0141. Finally, GRK's screws have sharper point angles (25-35 degrees) than tapping screws, which is consistent with Greenslade's description of drywall and twinfast wood screws. *See* Greenslade Deposition at 105-06. Accordingly, GRK's screws also possess the defining characteristics of "other wood screws."

Therefore, if the court focuses exclusively on the key characteristics that define wood and self-tapping screws, it is difficult to select one tariff provision over another for GRK's screws. One could reasonably conclude that GRK's screws satisfy the definition of self-tapping screws. Many of their added features essentially transform what would otherwise be a wood screw into a screw that satisfies the definition of a self-tapping screw. GRK's screws are capable of functioning exactly like self-tapping screws. Similarly, one could just as easily conclude that GRK's screws satisfy the definition of wood screws. Their features significantly improve upon standard wood screws and eliminate the need for time consuming predrilling, tapping, and countersinking operations. The Trim Head model resembles a finishing nail and the R4 model resembles a deck screw built on the twinfast design. Accordingly, the court believes that classification could reasonably be under either proposed subheading following a GRI 1 analysis. Therefore, analysis under the subsequent GRIs is required.

This case does not involve unfinished or incomplete goods.  Therefore, GRI 2 is

inapplicable.  Moving to GRI 3, when "goods are, *prima facie*, classifiable under two or more

headings [or subheadings], classification shall be effected as follows:

> (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

> (b) Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

> (c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

GRI 3(a)-(c).

Here, GRK's screws have the essential characteristics of both self-tapping and wood

screws.  They are therefore *prima facie* classifiable under subheading 7318.14.00 (Self-tapping

screws) and subheading 7318.12.00 (Other wood screws), as the court has defined those terms.

*See e.g., Lemans Corp. v. United States*, 660 F.3d 1311, 1316 (Fed. Cir. 2011); *Orlando Foods*,

140 F.3d at 1440.

Under GRI 3(a), the "most specific description shall be preferred to [subheadings]

providing a more general description."  In this case, the tariff terms do not lend themselves to a

relative specificity analysis. *See Lemans Corp.*, 660 F.3d at 1316 (Fed. Cir. 2011) ("Under the

so-called rule of relative specificity, we look to the provision with requirements that are more

difficult to satisfy and that describe the article with greatest degree of accuracy and certainty."). Neither subheading is more difficult to satisfy than the other. They each have their own defined set of characteristics that distinguish one type of screw from the other. If one tariff provision described the article with greater accuracy and certainty, this case would have been resolvable at GRI 1. Therefore, GRI 3(a) does not resolve the issue. Nor does GRI 3(b), which is reserved for composite goods consisting of different materials or made up of different components.

This leaves GRI 3(c). Although GRI 3(c) is to be rarely used, *see, e.g., Telebrands*, 865 F. Supp. 2d at 1280-81; here analysis under that rule is appropriate. GRI 3(c) provides that among subheadings which equally merit consideration, the goods shall be classified under the subheading "which occurs last in numerical order." *Cf. Orlando Foods*, 140 F.3d at 1442. Here, subheading 7318.14.10 (self-tapping screws) occurs last in numerical order when compared to subheading 7318.12.00 (other wood screws). Therefore, GRK's R4 and Trim Head screws are classified under subheading 7318.14.10, self-tapping screws. This is a logical outcome if one considers that the addition to the HTSUS of self-tapping screws generally reflects advances in design and technology within this universe of fasteners. In the absence of a clear classification path for the subject merchandise under GRI 1, classification by reference to GRI 3(c) leads the court to classify the subject merchandise under the last subheading.

## IV. CONCLUSION

For the foregoing reasons, summary judgment is granted in favor of Plaintiff. Judgment will be entered accordingly.

Dated:  January 14, 2013                                             /s/ Judith M. Barzilay
        New York, NY                                           Judith M. Barzilay, Senior Judge