was argument over a Government motion to set aside the notice of trial (which was denied), counsel for appellee repeatedly took the express position that this case involves a *different* issue from the *Mason* case. He was not then committing himself to the result in the *Mason* case, which was on appeal to this court and was not finally decided until a year later. He said:

I am here to say it involves a different issue. Whether it is a distinguishable issue will be one for adjudication of this Court, and perhaps later, the Court of Customs and Patent Appeals.

Since our *Mason* decision turned out to be an affirmance, appellee now, of course, heavily relied on it and attempts to transmute the different issue into an indistinguishable issue in order to enable him to demand new liquidations nearly 5 years after liquidations have been made so that there will be no default under section 514. Congress *said* he should have acted within 60 days to obtain a review and I think it intended just that.

I agree with the majority that this case should be dismissed. I disagree with the majority's reasons. If appellee's protest were, in fact, against the liquidation of March 13, 1958, I would dismiss it as too late. The protest, however, was directed against the *refusal to liquidate* "evidenced by the letter * * * dated February 12, 1963." Protests of such refusals are not, in my opinion, within the jurisdiction of the Customs Court. See 28 U.S.C. 1583 (1964). I would therefore dismiss this case as without jurisdictional foundation.

HAYES-SAMMONS CHEMICAL CO. v. UNITED STATES (No. 5257)*

*C.A.D. 935.

United States Court of Customs and Patent Appeals, May 9, 1968

*Stein and Shostak* (*Marjorie M. Shostak*, of counsel) for appellant.

*Edwin L. Wiesl, Jr.*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Owen J. Rader* for the United States.

[Oral argument April 1, 1968 by Miss Shostak and Mr. Rader]

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, KIRKPATRICK**

ALMOND, Judge, delivered the opinion of the court:

Hayes-Sammons Chemical Co. appeals from the judgment of the Customs Court, First Division,[1] overruling a protest against the collector's classification of crude barytes ore in bulk.

The merchandise was classified as "barytes ore, crude or unmanufactured" under paragraph 67 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108. A shipmment entered in April 1958 (Protest 58/17794) was assessed with duty at the rate of $2.70 per long ton and a shipment made in 1960 (Protest 60/27892) was assessed at the rate of $2.55 per long ton.

It is appellant's contention that the merchandise is entitled to entry free of duty under paragraph 1719 of said Tariff Act as crude minerals, not specially provided for.

The statutes involved are, in pertinent part, as follows:

Paragraph 67, as modified:

| Barytes ore, crude or unmanufactured. | $2.85 per ton (effective 6/30/56). |
| | $2.70 per ton (effective 6/30/57). |
| | $2.55 per ton (effective 6/30/58). |

Paragraph 1719 [Free List]:

Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for.

---

**Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

[1] 56 Cust. Ct. 115, C.D. 2618.

We have reviewed the evidence of record and find that it has been fairly and comprehensively set forth in the opinion of the Customs Court in summary form. We therefore adopt that summary as follows:

Evidence in the instant case showed that the material imported from Mexico, referred to as barite, was purchased and sold pursuant to no specification that it have any specific barium sulphate content. Such merchandise was ground and sold to oilfield drillers and producers drilling oil and gas wells for use in drilling mud. One company also sold it for weighting down pipes so they would sink and for weighting pneumatic tires to give them more traction. In those cases, also, the specific gravity was the prime function of the material.

The plaintiffs herein regularly had the material tested not only for its specific gravity but for its barium sulphate content. Another importer had barium sulphate tests run for a short time, but not thereafter. A third did not run chemical tests but only the physical test for specific gravity. One witness testified that hardness tests were run to show the soluble calcium and magnesium salts present, as they have a somewhat deleterious effect on some drilling muds, and it is desirable to keep them at a minimum. Tentative specifications of the American Petroleum Institute covering barite for drilling muds, drawn up in March 1962, were received in evidence as plaintiffs' exhibit 6. They provide for a minimum specific gravity of 4.20 and require a hardness test and a wet screen analysis. There was testimony that these specifications were accepted by the industry as minimum standards and were more lenient than those used prior to that time.

The witnesses did not use the material imported from Mexico for extracting barium sulphate or any other mineral. Claborne B. Brazeal, president of the importing company, testified that the material was marketed as barite drilling mud and was not offered for any other use, "[b]ecause we felt like that we didn't have material to offer to any other market. The material was not suitable for any other market except for the drilling mud industry." He did have a request from the Pittsburgh Plate Glass Co. for some chemical grade material but he was unable to meet their specifications of at least 94 percent barium sulphate and relatively small amounts of other minerals, such as iron and strontium. Other witnesses also had attempted to sell the material for paint pigment or for the manufacture of barium chemicals, but could not meet the required specifications. A witness whose firm mined and sold barytes ore for these purposes testified that it was sold on the basis of a barium sulphate content of 96 percent and an iron content of 1 percent.

John G. Lipps, Jr., a chemical engineer and owner and manager of Pan American Laboratories, testified that he had made over 5,000 analyses of material imported by the plaintiff company from Mexico for specific gravity and barium sulphate content. Specific gravity varied from 4.19 to 4.38 and barium sulphate from 75 to 95 percent. Other materials were present which have a similar specific gravity, such as strontium sulphate and some iron compounds. He also detected without quantitative or qualitative analysis, the presence of a material commonly called $R_2O_3$, a mixture of iron and aluminum oxide, and sometimes noticed the presence of carbonates and traces of metallic elements, such as nickel and copper. In analyzing the material covered by protest No. 60/27892, he noted the presence of a mixture of inorganic minerals and less than 1 percent of metallic material. Carbonates and $R_2O_3$ were also detected in material which contained over 90 percent barium sulphate. He had

made 5 or 10 complete analyses of the material, which included strontium content, iron content, silica, metallic elements, manganese, and barium carbonate.

Paul Seitz, a chemist associated with the plaintiff company, who also tested the barite material imported from Mexico for specific gravity and for barium sulphate content, found the former to range from 4.18 to 4.4 and the latter from 75 to over 90 percent. He detected the presence of $R_2O_3$, which he described as a compound including ferric oxide and aluminum trioxide. He found no correlation between the specific gravity and the barium sulphate content of the material.

It is well established that the collector's classification is prima facie impressed with a presumption of correctness. The burden rests upon the appellant to affirmatively remove that presumption and, in addition thereto, to prove his claimed basis for classification.

The issue, therefore, which must be resolved from the record before us, is whether appellant has affirmatively shown that the common meaning of "barytes ore, crude or unmanufactured," was, at the time of adoption of the Tariff Act in 1930, so limited as to exclude the importation at issue. *Davies Turner & Co.* v. *United States*, 45 CCPA 39. The thrust of appellant's contention appears to be that the merchandise as a whole consists of a mixture of various crude minerals, that nothing is extracted therefrom, that the use in which it is applied, drilling mud, is "completely different" from uses to which barytes ore was applied at the time of the enactment of the Tariff Act of 1930, and that the presence of the component minerals other than barium sulfate renders this particular material unsuitable and undesirable for the purposes for which barytes ore was imported in 1930. Appellant contends that it was the intent of Congress, manifested by the use of the word "ore," to limit the term of the statute, "barytes ore, crude" to that commodity from which barium sulfate could be profitably extracted, and that paragraph 67 is therefore an *eo nomine* use provision embracing within its intendment (only) that ore "used or suitable for use for the profitable recovery or extraction of barium sulfate * * *."

In support of this contention appellant relies upon numerous dictionary definitions of 1935, 1936 and 1963 vintage. We consider more appropriate and persuasive the definition of ore available to Congress at the time of its consideration and enactment of paragraph 67 in 1930. Webster's New International Dictionary of the English Language, 1927 edition, at page 1516, defines:

ore * * * 1. a. A native compound containing one or more metals; sometimes, also, a native metal or even a valuable native nonmetal, as sulphur. b. *Mining.* Any material containing valuable metallic constituents for the sake of which it is mined and worked; as, cinnabar is an *ore* of mercury; gold-bearing quartz is a gold ore; also, material mined and worked for nonmetals; as *pyrites* is a sulphur *ore.* The term *ore* has usually been applied, among miners, to the crude material obtained without other than hand sorting of the lumps; but where

mechanical concentration is practiced at the mine the concentrates are often called *ore*. Waste may of course contain valuable constituents and may, owing to improved processes, itself become ore.

Appellant relies on *United States* v. *Cherokee Brick & Tile Company*, 218 F.2d 424, 425 and *Doster* v. *Friedensville Zinc Co.*, 140 Pa. 147, 21 A. 251, 252, in support of its contention that the term "ore" is confined to some material from which some valuable matter or component may be extracted. These cases involve matters entirely foreign to customs issues. To say the least, they are not persuasive in support of appellant's contention in the light of the record under consideration. It may be noted, however, that in *American Smelting and Refining Co.* v. *United States*, 13 Ct. Cust. Appls. 507, T.D. 41391, cited in the opinion below, lead-bearing ores were "held dutiable on zinc content although zinc was not recovered, was eliminated in manufacture, and was positively detrimental." The court below stated:

Normally, components that would influence the tariff classification of merchandise and the duties applicable are not prevented from doing so by being unwanted and even eliminated in further manufacture. * * *

■ In our view, the mere fact that the importations in issue were used in connection with mud drilling in oil fields and not for the extraction of barium sulfate is not preculsive of their classification as an ore under paragraph 67. It is abundantly clear from information collated and published by the United States Tariff Commission prior to 1930 that much of the barytes ore used in this country went into pigment lithopone and in manufacturing ground barytes and barium chemicals. *Dictionary of Tariff Information*, 1924, page 59. Similar information disclosing various uses for barytes ore including use of the ground "natural mineral" as a filler in the paper industry is found in the *Summary of Tariff Information* (1921), pages 186–187, prepared by the United States Tariff Commission for use of the Senate Committee on Finance in its consideration of the Tariff Act of 1922, as well as in similar material prepared for use of the Ways and Means Committee of the House of Representatives for its consideration of the Tariff Act of 1930. The conclusion is inescapable, therefore, that prior to 1930 barytes ore was dealt in and recognized as an ore although no material was extracted therefrom. This is a direct refutation of appellant's contention that the material must be subjected to an extraction process in order that it may qualify as an ore under the Tariff Act.

Appellant's contention that only ore containing in excess of 90% barium sulfate can be commercially productive and the conclusion that the common meaning of "barytes ore, crude" therefore does not embrace ore with a barium sulfate content ranging from 76.4% to 88.9%

is in direct conflict with this court's holding in *United States* v. *Victoria Gin Co., Inc., W. H. Morton*, 48 CCPA 33, C.A.D. 759. In *Victoria Gin* the issue was whether the imported merchandise, which consisted of mineral material containing approximately 85% barium sulfate, was "barytes ore, crude" within the purview of paragraph 67 of the Tariff Act of 1930. The court observed that the evidence in that case proved only that barytes ore containing less than a given percent of barium sulfate "was not a commercially acceptable grade." However, this did not prevent its being referred to as an "ore." Commenting on the testimony of the Government's single witness, the court said:

Speaking as a manufacturer of lithopone, of which, in 1929, he produced about one-fourth of all produced in the country, he testified that in 1929 he purchased several carloads of crude barytes ore in Missouri that ran 89%, that his company used as low as 85% (several hundred tons of the North Carolina ore) and, further, that during that period, although 92% barium sulphate was specified in the purchase orders, a variance was allowed "up and down," that is, the buyer paid a premium on anything over 92 and the seller took a penalty for anything under 92.

The court further observed that it did not appear that the extraction of barium sulfate from low grade ore is or was in 1930 impossible, it being largely a matter of economics. Continuing, the court observed:

Congress could have easily specified the barium sulphate content requisite for the imposition of a duty if it had wished to tax only the product dealt in, but it chose to use a general term which included more than that. * * *

It should be clear from our holding in *Victoria Gin* that an ore is not removed from the tariff classification merely because it is presently uneconomical to extract values from it in a commercial operation.

Significant in its application here is the case of *C. J. Tower & Sons* v. *United States*, 47 CCPA 85, C.A.D. 734, wherein the court stated:

Moreover, if it be assumed, as appellant appears to contend, that U.S.P. vanillin was the only form in commercial use in 1930, that would not demonstrate that if and when a slightly less pure form was placed on the market the term vanillin would not properly apply to it. Tariff laws are made for the future as well as the present and are intended to embrace new articles as they are developed.

The Customs Court considered appellant's attempt to prove that the merchandise at bar was unusable in those industries which used barytes ore in 1930, but felt that the evidence presented was unpersuasive. The court said:

The difficulty here is that plaintiffs' witnesses * * *, all from the southwest and familiar chiefly with use of barytes in oil well drilling, do not show sufficient familiarity with other barytes-using industries to testify persuasively that they cannot or do not use low-grade ore. Conceding *arguendo* that they do not buy the imported Mexican variety, this may be due to considerations of transportation distance, which are likely to be controlling where a bulk low value, crude

material is involved. The unsuccessful efforts to sell Mexican barytes to these industries were not sufficiently sustained or widespread to meet the difficult burden of proving a negative.

In this connection it is pertinent to observe that the *Summary of Tariff Information*, 1929, page 330, indicates that the "cost of transportation limits the distance to which imported barytes can be shipped." We deem it pertinent to note that the testimony adduced by appellant concerning the use of the imported products was confined to one area of the country and to the oil drilling industry. This in our opinion leaves a hiatus, fatal to appellant's contention, with reference to use in chemical manufacturing and other areas of use to which the product has been adapted. ■ The evidentiary burden on appellant in this case was to prove by a preponderance of evidence that the imported material could not be used for the purposes for which barytes ore was used in 1930. We agree with the Customs Court that appellant failed to carry this burden.

Appellant's contention that the provision for "barytes ore, crude" in paragraph 67 is an *eo nomine* use provision limited to ore used or suitable for use for profitable recovery or extraction of barium sulfate is not tenable in the light of the record before us.

■ Paragraph 67 designates "Barytes ore, crude" *eo nomine*. There are no terms of limitation express or implied. It embraces a commodity by specific name well known to commerce, without qualification, and it is well settled that such is not a use provision. The language employed by this court in *United States* v. *Williams Clark Co., a/c American Agar and Chemical Co.*, 50 CCPA 67, C.A.D. 822, is clearly apposite here, wherein it is stated:

Paragraph 41 is an *eo nomine*, not a use, provision. As this court held in *Nootka Packing Co., et al.* v. *United States*, 22 CCPA 464, 466–467, T.D. 47464, an *eo nomine* designation, with no terms of limitation, will ordinarily include all forms of the named article. *Stated otherwise, all forms, grades and qualities of the named article are embraced by such a designation.* [Emphasis supplied and citations omitted.]

We have considered the arguments advanced by appellant and analyzed the numerous cases cited but do not find them persuasive of error in the decision of the Customs Court. We deem it pertinent to add that the doctrine of *noscitur a sociis*, advanced by appellant, has no application to the situation disclosed by this record. We hold that paragraph 67 is devoid of ambiguity on its face. The term "barytes ore, crude or unmanufactured" constitutes plain, unambiguous language defining a specific class of merchandise irrespective of its quality or use and is not susceptible to any meanig other than that conveyed directly by the clear language employed. ■ Only in situations of

ambiguity requiring resort to principles of statutory construction may resort be had to the rule of *noscitur a sociis*. *United States* v. *R. F. Downing & Co.*, 17 CCPA 194. We do not have that situation here.

In our opinion appellant has not borne the burden incumbent upon it to overcome the presumption which attaches to the collector's classification. The judgment of the Customs Court must, therefore, be *affirmed*.