Opinion for the court filed by Chief Judge PROST. Dissenting opinion filed by Circuit Judge REYNA.
PROST, Chief Judge.
The United States appeals from the decision of the United States Court of International Trade granting GRK Canada Ltd.’s (“GRK”) cross-motion for summary judgment that various screws imported by GRK were properly classified as “self-tapping screws” under subheading 7318.14.10 of the Harmonized Tariff Schedule of the United States (2008) (“HTSUS”). GRK Canada, Ltd. v. United States, 884 F.Supp.2d 1340, 1342 (Ct. Int’l Trade 2013). Because the Court of International Trade refused to consider the use of the screws at any step of determining the classification of the subject articles at issue, we vacate and remand for further proceedings consistent with this opinion.
I
The imported articles at issue are GRK’s Model R4 Screws (“R4”), RT Composite Trim Head Screws (“RT”), and Fin/ Trim Head Screws (“Fin/Trim”). All these screws are made with corrosion-resistant case-hardened steel, and they are marketed for use in carpentry as building material fasteners. R4 screws, inter alia, have a flat self-countersinking[1] head designed to cut away at the top layer of the material as the screw is driven into place. By contrast, RT and Fin/Trim screws are recommended for fine carpentry and trim applications, and these models have much smaller heads that are designed to prevent the screws from cracking and splitting the target material. RT screws, unlike Fin/ *1356 Trim screws, include reverse threading, a second set of threads near the head that allows the head to be less noticeable along the surface of the target material. Each GRK model is available in a variety of lengths, diameters, and thread designs.
GRK imported the subject screws between January 2008 and August 2008. U.S. Customs and Border Protection (“CBP”) classified the screws at liquidation under the HTSUS subheading 7318.12.00, “other wood screws.” This classification carries a 12.5% ad valorem duty. GRK protested, claiming that the screws should instead have been classified under subheading 7318.14.10, “selftapping screws,” which would make them subject to a 6.2% ad valorem duty. The CBP denied GRK’s protests, and GRK brought its challenge to the Court of International Trade, where the parties filed cross-motions for summary judgment.
II
The Court of International Trade described this as “a challenging case,” because the HTSUS does not specifically define either subheading. GRK, 884 F.Supp.2d at 1345. It noted that the subheadings were eo nomine provisions and that, as such, they described “an article by a specific name, not by use.” Id. It further characterized the government’s position as relying not only on the physical characteristics of screws but also the materials in which they are used. The government argued that the scope of the “other wood screws” subheading was screws that were intended for use in wood or resilient materials (e.g., wood composite), while “self-tapping screws” were primarily intended to be used in materials such as steel, concrete, and marble. The government further argued that GRK’s screws were intended for use in wood or other resilient materials, and were therefore correctly classified as “other wood screws.” The Court of International Trade concluded that, as such, the government’s argument “depends heavily on use,” and “[t]his is a weakness that ultimately undermines the Government’s proposed classification.” Id.
The court extensively analyzed what it called “use” arguments advanced by the government. In particular, it described the government’s argument as an attempt to “convert an eo nomine provision into a use provision.” Id. at 1353. The court’s analysis distinguished the case law on which the government relied as relating to the predecessor to the HTSUS, the Tariff Schedules of the United States (TSUS). In TSUS cases, courts had considered the use of articles in interpreting eo nomine provisions. However, in the Court of International Trade’s view, such case law was not binding under the HTSUS due to its “far greater specificity, continuity, and completeness than the TSUS.” Id. Therefore, it determined that it would focus instead on physical characteristics in determining the scope of the subheadings at issue and in subsequently classifying the subject screws.
The Court of International Trade consequently established “workable definitions” for the subheadings. It construed “other wood screws” as “having (1) a flat, recessed, oval, round, or slotted head, (2) partially unthreaded shank, (3) coarse pitch spaced threads, and (4) a sharp gimlet point, and may also have (5) potential modifications to these criteria (such as sharper point angles or case hardening) so long as the modified screw retains an essential resemblance to a standard wood screw.” Id. at 1348. A “self-tapping screw” was construed as “being a specially hardened screw that can cut or form its own threads in the substrate without a separate tapping operation. More specifi- *1357 eally, self-tapping screws (1) are made of case hardened steel, (2) have passed certain performance requirements, and (3) do not require a separate tapping operation.” Id. at 1352.
The Court of International Trade proceeded to then apply the General Rules of Interpretation of the Harmonized Tariff Schedule of the United States (“GRI”) to classify the screws. Following the definitions that it had established, the court described GRK’s screws as having features of both self-tapping and wood screws. In particular, GRK screws are made of heat-treated, case hardened steel, were manufactured to meet minimum torsional strength requirements, and could cut mating threads without separate tapping. GRK screws also resemble standard wood screws while possessing modifications of the various parameters that the court determined were characteristic of the “other wood screws” classification.
The court began its analysis by determining that because it would be reasonable to conclude that the GRK screws were both self-tapping and wood screws, the analysis had to proceed beyond GRI 1. It then skipped GRI 2, as it applies only to goods that are either unfinished or incomplete. Based on its working definitions of the subheadings, the court found that GRI 3(a) was inapplicable, as the subheadings described articles at similar levels of specificity. It also determined that GRI 3(b) did not to apply, as the screws were not composite goods. The Court of International Trade finally settled on the “rarely used” GRI 3(c), in which goods are classified under the subheading that occurs last in numerical order — in this case, self-tapping screws, which are classified under subheading 7318.14.10 (by contrast to other wood screws under 7318.12.00). Id. at 1356. Accordingly, it ruled in favor of GRK, holding that the subject screws should be classified as self-tapping screws.
The United States appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
Ill
The first step of a classification decision is to determine the proper meaning of a tariff provision, which is a question of law reviewed de novo. Universal Elecs. Inc. v. United States, 112 F.3d 488, 491 (Fed.Cir.1997). The second step is to determine whether the subject imports are within a possible heading, which is a question of fact reviewed for clear error. Id. We review the Court of International Trade’s grant of summary judgment as a matter of law, deciding de novo the interpretation of tariff provisions as well as whether there are genuine disputes of material fact. Millenium Lumber Distribution Ltd. v. United States, 558 F.3d 1326, 1328 (Fed.Cir.2009).
In determining the proper meaning of a tariff provision, we have held that where the HTSUS does not expressly define a term, “the correct meaning of the term is its common commercial meaning.” Arko Foods Int’l, Inc. v. United States, 654 F.3d 1361, 1364 (Fed.Cir.2011). To determine the common commercial meaning, a court “may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities.” Airflow Tech., Inc. v. United States, 524 F.3d 1287, 1291 (Fed.Cir.2008). In particular, a court also refers to the Explanatory Notes accompanying the HTSUS, which, though not controlling, provide interpretive guidance. E.T. Horn Co. v. United States, 367 F.3d 1326, 1329 (Fed.Cir.2004).
Neither party disputes that the tariff terms at issue in this case — “other *1358 wood screws” and “self-tapping screws”— are eo nomine provisions. “An eo nomine designation with no terms of limitation, will ordinarily include all forms of the named article.” Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed.Cir.1999) (quoting Hayes-Sammons Chem. Co. v. United States, 55 C.C.P.A. 69, 75 (1968)). Although an eo nomine provision generally “describes the merchandise by name, not by use,” such a provision may be limited by use when “the name itself inherently suggests a type of use.” Id. As discussed above, the Court of International Trade distinguished prior analysis under the TSUS that incorporated use in determining the meaning of related eo nomine provisions and held that it “must instead operate from the premise that the HTSUS provisions here are eo nomine and do not implicate a use analysis.” Id. at 1354. On that basis, it rejected the government’s argument that the names of the tariff classifications inherently suggest that the kinds of materials in which the screws are used should be considered as part of their common commercial meaning.
As an initial matter, our cases do not lead to the conclusion the Court of International Trade inferred that, under the HTSUS, once a provision is regarded as eo nomine because the heading describes goods by their names, use should in no respect be weighed in classifying subject articles.
First, we have recognized that under certain circumstances use may be of “paramount importance” in guiding the court towards the proper commercial meaning of a term. United States v. Quon Quon Co., 46 C.C.P.A. 70, 73 (1959). Quon Quon, for example, concerned a dispute over the classification of wicker table tops intended for use as patio furniture that were made of woven rattan as “baskets.” Id. at 71. Our predecessor court determined that just because the tariff term “baskets” designated articles by name did not mean that use could not be considered in properly classifying the articles as furniture. Id. at 73-74. Of course, Quon Quon is a case determined under the old TSUS that has now been replaced by the HTSUS, which, as the Court of International Trade points out, includes “far greater specificity, continuity, and completeness.” GRK, 884 F.Supp.2d at 1353 (quoting Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West’s Fed. Forms, National Courts § 13343 (2d ed.2012)). Nevertheless, even under the HTSUS, classification decisions may still require an analysis of the intended use of products. For example, in CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1368-69 (Fed.Cir.2011), we cited Quon Quon in reversing the Court of International Trade’s determination that articles were “improved backpacks” on the grounds that their principal intended use was for hydration. We held that the “hydration component of the subject articles is not merely incidental to the cargo component but, instead, provides the articles with a unique identity and use that removes them from the scope of the eo no-mine backpack provision.” Id. at 1369 (emphasis added). Therefore, even though CamelBak concerned eo nomine HTSUS provisions, we recognized that the use of the subject articles was an important aspect of their identity and, consequently, the articles’ classification. In such a case, the court’s inquiry includes the subject article’s physical characteristics, as well as what features the article has for typical users, how it was designed and for what objectives, and how it is marketed. Id. at 1367-69; see also Casio, Inc. v. United States, 73 F.3d 1095, 1098 (Fed.Cir.1996).
Second, we have taken into account use as an element of determining the proper meaning of classification terms — even *1359 under the HTSUS. This is how we interpret tariff designations whose common commercial meaning includes the intended use of articles. For example, when we previously considered the meaning of the eo nomine provision “vanity cases,” we held that any article so classified must have the “containing, carrying, or organizing” of cosmetics as its “predominant use.” Len-Ron Mfg. Co., Inc. v. United States, 334 F.3d 1304, 1311 (Fed.Cir.2003). By contrast, in a case like Carl Zeiss, neither the common meaning of the term itself— “compound optical microscopes” — nor the term’s use in trade or commerce excluded microscopes that might be used in surgery. 195 F.3d at 1379. Therefore, the use may be considered as part of the definition of eo nomine provisions, where, even if the eo nomine provision describes goods with respect to their names, the name itself may “inherently suggest[ ] a type of use.” Id. at 1379.[2]
In sum, even under the HTSUS, use of subject articles may, under certain circumstances, be considered in tariff classification according to eo nomine provisions. This may occur at the stage of establishing the proper meaning of a designation when a provision’s name “inherently suggests a type of use.” Id. Or, once tariff terms have been defined, it may be the case that the use of subject articles defines an articles’ identity when determining whether it fits within the classification’s scope. See, e.g., CamelBak, 649 F.3d at 1369.
IV
The case at hand concerns two tariff provisions that must be interpreted, namely “other wood screws” and “self-tapping screws.” As an initial matter, our common understanding of “other wood screws” seems naturally aligned with the intended use of screws. “Wood screws,” as designated by the tariff provision, are not screws made of wood — but rather metal screws used to fasten wood. Even without resort to any extrinsic authority, it is evident that the material with which the screw is intended to be used is inherent within the name of the eo nomine tariff classification “other wood screw.”
The HTSUS Explanatory Notes, Fourth Edition (2007) for Heading 73.18 also expressly reference materials in which the screws are to be used. “Screws for wood,” according to the Explanatory Notes:
Screws for wood differ from bolts and screws for metal in that they are tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material. Further, wood screws almost always have slotted or recessed heads and they are never used with nuts.
The heading includes self-tapping (Parker) screws; these resemble wood screws in that they have a slotted head and a cutting thread and are pointed or tapered at the end. They can therefore cut their own passage into thin sheets of metal, marble, slate, plastics, etc.
J.A. 710.
As the Explanatory Notes indicate, the physical characteristics of “wood screws” and “self-tapping screws” will generally be similar. Indeed, self-tapping screws “resemble” wood screws in that they include slotted heads and cutting threads, and the screws “bite their way into the material.” *1360 However, self-tapping screws are intended to cut into metal and slate.
Definitions of the terms in engineering standards further support meanings that include the screws’ intended use. For example, the ANSI/ASME Standard B18:12-2001 (Glossary of Terms for Mechanical Fasteners) indicates that “a wood screw ... is designed to produce a mating thread when assembled into wood and other resilient materials.” J.A. 660. Conversely, “a tapping screw ... is designed to form or cut a mating thread in one or more parts to be assembled.” J.A. 662.
Prior decisions of the United States Customs Court involving predecessors to the relevant provisions in the TSUS also support an understanding of wood screw that implicates use. In these cases, the Customs Court specifically confronted the problem of distinguishing between TSUS designations of “wood screws” and screws made “of iron or steel.” The Customs Court determined that when considering the eo nomine provision for “wood screws” it should include the primary use of the screws at issue as a factor in determination of its proper classification. Trans-Atl. Co. v. United States, 68 Cust.Ct. 105, 108 (1972); see also David Komisar & Son, Inc. v. United States, 77 Cust.Ct. 88 (1976) (“A machine screw will make its own threads in metal and a wood screw will do the same in wood.”). To be sure, the tariff designations changed in the HTSUS; in particular, “self-tapping screws” is a new subheading. However, the principle behind the designation of different screw types remains the same: the material that screws are principally intended to pass through and fasten is an important aspect of how screw types are defined.
Indeed, the end result of the Court of International Trade’s analysis itself suggests the error in refusing to consider use of subject articles. The HTSUS has been modernized to reflect current commercial practice, and its hierarchical classification is more specific and carefully designed than the TSUS. The court nevertheless still ended up at the rarely used “tiebreaker” step of GRI 3(c). This was the inevitable result of its approach to distinguish between the relevant subheadings.
According to its working definitions, effectively the difference between an “other wood screw” and a “selftapping screw” is that the latter is “specially hardened,” meaning that it is made of case hardened steel and has “passed certain performance requirements.” GRK, 884 F.Supp.2d at 1352. Therefore, following that definition, a conventional wood screw transforms to a “self-tapping screw” once the screw is made of a hardened material, a relatively trivial change that could be motivated by desiring improved characteristics in cutting or anchoring screws in wood.[3]
In sum, the Court of International Trade defined selftapping screws as simply improved forms of wood screws. But, that cannot be the only difference of these eo nomine provisions. The objective of an eo nomine designation is to capture all forms of the named article, even including articles that have “been improved or amplified but whose essential characteristic is preserved or only incidentally altered.” Casio, 73 F.3d at 1098. Therefore, an eo nomine classification within HTSUS must capture all forms of a named good, includ *1361 ing improvements that do not change the essential characteristic of the articles. Consequently, to be workable, HTSUS provisions must be defined distinctly enough to allow the classification of improved forms of goods — provided that such improvements are not fundamental changes. The use of goods may be an important aspect of the distinction of certain eo nomine provisions, in particular, where, as here, the name of the provisions refers directly to the use of subject articles. This is why, even within the context of the HTSUS, we should not be “so trusting of our own notions of what things are as to be willing to ignore the purpose for which they were designed and made and the use to which they were actually put.” Quon Quon, 46 C.C.P.A. at 73.
The record is replete with evidence that the common commercial meanings of “other wood screws” and “selftapping screws” include the materials with which the screws are intended and designed for use. While GRK’s screws may be more difficult to characterize than conventional screw designs, there is no reason to make tariff classification more complicated by unduly ignoring such a critical factor at either step of the analysis — whether defining the legal meaning of the tariff terms at issue or determining the proper classification of the subject articles.
V
Accordingly, we vacate the Court of International Trade’s findings and subsequent determination on the proper classification of the subject article, and remand for further proceedings consistent with this opinion.
VACATED AND REMANDED

. "Countersinking” is the operation of enlarging and beveling the rim of a drilled hole such that the screw is inserted flush with the surface.

. Classification of subject articles may then need to reach the Additional Rules of Interpretation (“ARI”), which distinguish the treatment of articles based on whether tariff classifications are controlled by principal or actual use. Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363 (Fed.Cir.1999); see also StoreWALL, LLC v. United States, 644 F.3d 1358, 1365-67 (Fed.Cir.2011) (Dyk, J„ concurring).

. The Court of International Trade also determined that self-tapping screws, unlike other wood screws, must be designed to pass performance requirements. It is not clear why wood screws generally would not be tested for their strength and ability to function in wood. Indeed, the advertising for GRK Model R4 screws shows data for the screws' performance in mating wood to wood. J.A. 408.