# United States Court of Appeals for the Federal Circuit

---

**GRK CANADA, LTD.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2016-2623

---

Appeal from the United States Court of International Trade in No. 1:09-cv-00390, Judge Claire R. Kelly.

---

Decided: March 20, 2018

---

CRAIG E. ZIEGLER, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, argued for plaintiff-appellee.

STEPHEN ANDREW JOSEY, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, argued for defendant-appellant. Also represented by JASON M. KENNER, BENJAMIN C. MIZER, JEANNE E. DAVIDSON, AMY M. RUBIN.

---

Before PROST, *Chief Judge,* REYNA, and STOLL, *Circuit Judges.*

REYNA, *Circuit Judge.*

The United States appeals from a final judgment of the United States Court of International Trade granting GRK Canada, Ltd.'s motion for summary judgment that various screws imported by GRK were properly classified as "self-tapping screws" under subheading 7318.14.10 of the Harmonized Tariff Schedule of the United States. Because the Court of International Trade properly classified GRK's imported screws, we affirm.

## BACKGROUND

This matter returns to the court following remand to the Court of International Trade. *GRK Can., Ltd. v. United States* ("*GRK IV*"), 180 F. Supp. 3d 1260 (Ct. Int'l Trade 2016); *see also GRK Can., Ltd. v. United States* ("*GRK I*"), 884 F. Supp. 2d 1340 (Ct. Int'l Trade 2013) *vacated and remanded*, 761 F.3d 1354 (Fed. Cir. 2014) ("*GRK II*"), *reh'g denied*, 773 F.3d 1282 (Fed Cir. 2014) (per curiam) ("*GRK III*").

Between January 2008 and August 2008, GRK imported three types of screw fasteners into the United States. *GRK IV*, 180 F. Supp. 3d at 1263. The three types of screws at issue are GRK's Model R4 Screws ("R4"), RT Composite Trim Head Screws ("RT"), and Fin/Trim Head Screws ("Fin/Trim").[1] *Id.*. GRK's screws are used to mate dissimilar materials, for example, to mate plastics or dense composite materials to wood. *Id.* at

---

[1]    The RT and Fin/Trim Head Screws are both varieties of GRK's Trim Head screws, and are collectively referred to as Trim Head screws in the Court of International Trade's decision.

1264. To that effect, all three GRK screws are made with corrosion-resistant, case-hardened steel and "can be used to penetrate materials such as sheet metal, plastics, medium-density fiberboard, polyvinyl chloride (PVC) board, cement fiberboard, melamine, arborite, and other man-made composite materials." *Id.* (internal quotation marks omitted).

Upon GRK's importation of the subject screws, United States Customs and Border Protection ("Customs") classified the screws as "other wood screws" under subheading 7318.12.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"),[2] subject to an import duty of 12.5% *ad valorem*. *Id.* at 1263. GRK protested, claiming that the screws should have been classified under subheading 7318.14.10 as "self-tapping screws," a classification that carries a 6.2% *ad valorem* duty. Customs denied GRK's protest. *Id.* at 1272.[3]

GRK appealed Customs' decision to the Court of International Trade, which granted summary judgment in GRK's favor. The court determined, as *eo nomine* provisions that describe all forms of an article by a specific name, the subheadings for "other wood screws" and "self-tapping screws" cannot be interpreted based on use

---

[2]    All references to the HTSUS refer to the governing provision determined by the date of importation, here the 2008 version. *See LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).

[3]    The parties do not contest the eight-digit level classification of whether GRK's "self-tapping screws" fall under subheading 7318.14.10 for "self-tapping screws having shanks or threads with a diameter of less than 6 mm," and not under subheading 7318.14.50 for "self-tapping screws having shanks or threads with a  diameter of 6 mm or more."

"[a]bsent limiting language or contrary legislative intent." *GRK I*, 884 F. Supp. 2d at 1345. Applying the General Rules of Interpretation ("GRIs"), the Court of International Trade defined the classification scope of "other wood screws" and "self-tapping screws" without accounting for use. *Id.* at 1348, 1351–52. The court found, based on their design characteristics, that all three of GRK's imported screws are properly classified as "self-tapping screws" under subheading 7318.14.10. *GRK I*, 884 F. Supp. 2d at 1356. The Government appealed.

On appeal, we held that the Court of International Trade erred in "refus[ing] to consider the use of the screws at any step of determining the classification of the subject articles at issue." *GRK II*, 761 F.3d at 1355. We instructed the Court of International Trade to consider use in interpreting the common and commercial meaning of HTSUS terms (1) where the name of the tariff provision itself inherently suggests a type of use, or (2) "once the tariff terms have been defined . . . the use of subject articles defines an article['s] identity when determining whether it fits within the classification's scope." *Id.* at 1359 (first citing *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1369 (Fed. Cir. 2011); then citing *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)). Accordingly, we vacated the judgment of the Court of International Trade and remanded for the court to consider use in both "defining the legal meaning of the tariff terms at issue" and in "determining the proper classification of the subject articles." *Id.* at 1361.

On remand, the Court of International Trade ordered pretrial discovery limited to the issues of "intended use," "principal use," and "actual use" of GRK's imported screws. *GRK IV*, 180 F. Supp. 3d at 1262. Based on this additional discovery, the court recognized that the R4 screw is used in "wood, particle board, plastic, sheet metal, cement fiberboard and wood decking, pressure treated lumber decking, cedar and redwood decking," and

"can be used in woodworking and other applications and is designed to affix thin metal to wood." *Id.* at 1265. With respect to the RT and Fin/Trim screws, the court noted that these screws are "used for most fine carpentry applications and trim applications," and can also be used "to anchor composite decking to wood beams." *Id.*

The Court of International Trade undertook a new classification analysis. As a threshold determination on whether to apply the GRIs or the U.S. Additional Rules of Interpretation ("ARIs"),[4] the court determined that neither tariff term "other wood screws" nor "self-tapping

---

[4]  The ARIs provide the interpretative framework for tariff provisions defined by use. *See, e.g.*, *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312 (Fed. Cir. 2012). We noted in *GRK II* that where the name of a tariff provision inherently suggests a type of use, the ARIs may need to be applied for the Court of International Trade to properly construe the tariff provision. 761 F.3d at 1359 n.2 (citing *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1363 (Fed. Cir. 1999)). However, we did not instruct the Court of International Trade on exactly how use, either principal or intended, should be considered in determining the meaning and scope of *eo nomine* provisions. *Id* at 1360–61. Nor did we abrogate the general rule that the ARIs do not apply to the construction of *eo nomine* tariff terms. *See Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017) (declining to apply the ARIs despite the tariff provision disclosing certain uses because the interpretation "centered on terms describing an article by a specific name"). Here, the parties do not dispute that the GRIs control the interpretation of the *eo nomine* provisions at issue. We therefore need not decide whether the ARIs should have been consulted in this case.

screws" were so controlled by use such that the court would be required to consult the ARIs. *Id.* at 1271. The court found that the terms' physical characteristics "coincide to such an extent that the court must consider the intended use or design implicated by the tariff terms in addition to the physical characteristics" to distinguish between the terms' common and commercial meanings. *Id.* Therefore, the court applied the GRIs, as it had in *GRK I*, and additionally considered the subject screws' intended use. Specifically, the Court of International Trade considered "how a typical user would use the product, and its impact on defining the tariff term." *Id.* at 1277. It found that the Explanatory Notes suggest "that self-tapping screws are meant to be used to fasten a non-fibrous material (<u>i.e.,</u> 'sheets of metal, marble, slate, plastics') to some other material." *Id.* In contrast, the court found that "[n]early all dictionary definitions suggest that wood screws are intended to be used to affix wood to wood or to other fibrous materials." *Id.*; *see id.* at 1278 (first citing *McGraw-Hill Dictionary of Scientific and Technical Terms* 2302 (6th ed. 2003); then citing *Academic Press Dictionary of Science and Technology* 2378 (Christopher Morris ed., 1992)). The court rejected any notion that self-tapping screws are somehow limited to fastening non-fibrous material to other non-fibrous material. *Id.* Rather it found that "industry standards and dictionary definitions support the conclusion that the tariff term self-tapping screw includes screws that are intended to fasten non-fibrous materials to fibrous materials as well as to non-fibrous materials." *Id.* at 1277–78 (citing *Academic Press Dictionary of Science and Technology* 1951 (Christopher Morris ed. 1992); ANSI/ASME Standard 18.6.4 ¶¶ 1.3.1, 1.3.2).

Based on the HTSUS headings, the section and chapter notes, the explanatory notes, the available lexicographic sources, and its review of intended use, the court concluded that (1) the common and commercial meaning

of "other wood screw" is "a screw that forms its own thread by compressing surrounding material designed to fasten wood to wood or other fibrous material," and (2) the common and commercial meaning of "self-tapping screw" is a "specially hardened screw, that meets minimum torsional strength requirements, that can cut away material to form a mating thread in non-fibrous material, and is designed to fasten non-fibrous materials, such as metal, to either fibrous or non-fibrous materials." *Id.* at 1278 (internal quotation marks omitted). The court confirmed its conclusion by reviewing the parties' experts' testimonies, finding the testimonies to be consistent with its constructions. *Id.*

The court then turned to whether GRK's imported screws are properly classified as "other wood screws" or as "self-tapping screws" under the court's constructions. *Id.* at 1280. Based on the undisputed facts, it found that the R4, RT, and Fit/Trim screws are "self-tapping screws" because they are capable of cutting a mating thread in non-fibrous materials, are made of case-hardened carbon steel or stainless steel, and meet minimal torsional strength requirements. *Id.* at 1280–81. The Court of International Trade further found that the intended use of GRK's screws supports their classification as self-tapping screws because they are "intended for fastening non-fibrous materials to other materials." *Id.* at 1281. The court relied on the fact that GRK's screws have a "Climatek coating" for its case-hardened carbon steel screws which allow the screws "to be driven into even very, very dense materials." *Id.* (internal quotation marks and citation omitted). It also found that the design of the R4 and RT screws support classifying them as self-tapping because they have countersinking heads that allow for the screws to penetrate "hard, brittle, or thin plasticized surfaces veneered onto lumber or composite wood without causing mushrooming." *Id.* at 1282. "Mushrooming" occurs when "non-fibrous material that

the screw cuts and removes as it is driven would rise and create mushroom on the surface," a concern that is not relevant for fastening wood or other fibrous materials. *Id.* (citations omitted). The RT screw also has a secondary reverse threading to avoid mushrooming altogether. *Id.* Lastly, the court found that the "special points and threading patterns" on the screws "better enable the screws at issue to be used in materials such as 'sheet metal, plastics, medium-density fiberboard, polyvinyl chloride (PVC) board, cement fiberboard, melamine, arborite, and other man-made composite materials.'" *Id.* After accounting for these design features and the screws' intended use, the court found that GRK's imported screws fall under the HTSUS tariff classification subheading 7318.14.10 for "self-tapping screws." *Id.* The Court of International Trade thus entered summary judgment in favor of GRK.

The Government appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review de novo the grant of summary judgment by the Court of International Trade. *Drygel, Inc. v. United States*, 541 F.3d 1129, 1133 (Fed. Cir. 2008). The classification of goods under the HTSUS involves two steps. First, we ascertain the proper meaning of the tariff provision, which is a question of law that we review without deference. *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013). Second, we determine whether the goods come within the description of those terms. *Id.* This second step is a factual question that we review for clear error. *Id.*

We accord deference to Customs' classification rulings relative to the rulings' "power to persuade." *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001). We, like the Court of International Trade, have an independent responsibility to decide the proper meaning and scope of

HTSUS terms. *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

DISCUSSION

The Government raises two issues on appeal. First, it argues that Court of International Trade erred in defining the HTSUS tariff terms "other wood screws" and "self-tapping screws" by failing to consider physical characteristics that make them suitable for inserting and anchoring into wood or non-resilient materials, respectively. Second, should we find the Court of International Trade erred in its construction of the tariff terms, the Government contends that this error caused the court to misclassify GRK's screws as "self-tapping screws" instead of "other wood screws." Because we agree with the Court of International Trade's constructions of the common and commercial meanings for "other wood screws" and "self-tapping screws," we affirm.

A. HTSUS CLASSIFICATION FRAMEWORK

To construe a tariff provision, we apply the GRIs, which are part of the HTSUS, in numerical order. *Kahrs*, 713 F.3d at 644. If we find that a GRI is dispositive, we go no further. *Schlumberger*, 845 F.3d at 1163; *Mita Copystar Am. v United States*, 160 F.3d 710, 712 (Fed. Cir. 1998). We construe HTSUS terms according to their common and commercial meanings, "which are presumed to be the same." *Carl Zeiss,* 195 F.3d at 1379. Under GRI 1, we first look at the language of a classification heading, and any section or chapter notes, to determine if the subject product is classifiable under that heading. *Schlumberger*, 845 F.3d at 1163 (citing *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998)). We may consult reliable sources of information to discern the common meaning of a tariff term, including dictionaries and scientific authorities. *Kahrs*, 713 F.3d at 644. Although not binding, we may also consult the explanatory notes of the relevant chapters for guidance,

as they generally indicate the proper construction of the various HTSUS provisions. *Id.* at 645 (citing *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000)).

Here, where there is no factual dispute over the structure, design, or use of GRK's imported screws, we need only determine the proper meaning and scope of the relevant HTSUS provisions. *Id.*

B. GRK'S SCREWS ARE SELF-TAPPING SCREWS

The Government argues that the common and commercial meaning of "other wood screw" is "a screw that is designed to be inserted and/or anchored into wood and other resilient materials." Appellant's Br. 24–25. Conversely, the Government contends that the common and commercial meaning of "self-tapping screws" are screws exclusively "designed for use in non-wood applications such as fastening concrete, marble, or metal to metal." *Id.* at 28–29. The Government thus avers that because GRK's screws are designed for use in wood and resilient materials, they should be classified as "other wood screws" under HTSUS 7318.12, not as "self-tapping screws" under HTSUS 7318.14. *Id.* at 29.

We note that the parties do not dispute that the HTSUS tariff terms at issue are *eo nomine* provisions. An *eo nomine* provision is one that names a specific product or describes by name the subject merchandise. *See Clarendon Mktg., Inc. v. United States*, 144 F.3d 1464, 1467 (Fed. Cir. 1998). An *eo nomine* provision includes all forms of the named article, including improved forms. *CamelBak*, 649 F.3d at 1364–65.

Despite the Government's recognition that the disputed terms are *eo nomine* provisions, it asks the court to define the common and commercial meaning of "wood screw" and "self-tapping screw" based on what material the screw is intended to be anchored into. Thus, the

Government argues that the use of GRK's screws controls our interpretation of the tariff provisions. In *GRK II*, we instructed the Court of International Trade to consider use of the screws in interpreting the HTSUS tariff provisions, but the Government now seeks to elevate use as the sole consideration. We decline to do so. Adopting the Government's position would all but abrogate the foundational tenet of tariff classification that *eo nomine* provisions are distinct from use provisions and do not depend on either principal or actual use of the imported merchandise. *See Aromont*, 671 F.3d at 1312.

We also conclude that the Government's proposed interpretation of "other wood screws" to mean "a screw that is designed to be inserted or anchored into wood and other resilient materials" is not borne out by the record. The Government conceded during oral argument that "there is not an explicit reference to the term anchoring" in any of the record material aside from one dictionary definition that uses the term "insertion" and the Government's proffered expert testimony. Oral Arg. at 3:01–5:10, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2016-2623.mp3. As explained below, the Government's proposed interpretations of the disputed tariff terms are unsupported by the record.

The Government supports its argument by first looking to the Glossary of Terms published by the American National Standards Institute ("ANSI") and the American Society of Mechanical Engineers ("ASME"). We have recognized ANSI's and ASME's expertise in the field of fasteners. *Rocknel Fastener, Inc. v. United States*, 118 F. Supp. 2d 1238, 1244 (Ct. Int'l Trade 2000) (collecting cases), *aff'd*, 267 F.3d 1354 (Fed. Cir. 2001). Specifically, the Government relies on ANSI/ASME Standard B18.12-2001, which provides, in relevant part, the following definitions of wood screws and tapping screws:

> 3.1.2.30 *wood screw*: a thread forming screw having a slotted or recessed head, gimlet point, and a sharp crested, coarse pitch thread, and generally available with flat, oval and round head styles. It is designed to produce a mating thread when assembled into wood or other resilient materials.
>
> 3.1.2.22 *tapping screw*: has a slotted, recessed, or wrenching head and is designed to form or cut a mating thread in one or more of the parts to be assembled.

J.A. 770, 772. According to the Government, the screws' intended purpose is the distinguishing feature because "wood screws are those tapping screws that are designed to be used and anchored in wood and other resilient materials." Appellant's Br. 22. But the Government does not establish what design characteristics of tapping screws or wood screws would result in the different applications. The Government conceded at oral argument that a self-tapping screw may be used in wood in some limited circumstances, but such use would not be "ideal." Oral Arg. 6:04–6:17.

The subheadings' explanatory notes also do not lend strong support to the Government's position that self-tapping screws are limited to use in non-resilient materials. The explanatory notes for fasteners under heading 7318 do not consider "insertion" or "anchoring" as the distinguishing feature between self-tapping and wood screws, but provide the following clarification:

> **Screws for wood** differ from bolts and screws for metal in that they are tapered and pointed, and they have a steeper cutting thread since they have to bite their own way into the material. Further, wood screws almost always have slotted or recessed heads and they are never used with nuts.

> **[S]elf-tapping (Parker) screws** . . . resemble wood screws in that they have a slotted head and a cutting thread and are pointed or tapered at the end. They can therefore cut their own passage into thin sheets of metal, marble, slate, plastics, etc.

J.A. 812. As with the ANSI/ASME Standard, nothing in the explanatory notes limits the material that self-tapping screws can be anchored into. Rather, the explanatory notes define self-tapping screws based on the physical features that permit the screws to cut mating threads into certain materials like metal, marble, slate, and plastics. *Id.* This definition is consistent with the Court of International Trade's construction that allows for a self-tapping screw to fasten non-fibrous materials to either fibrous or non-fibrous materials. *GRK IV*, 180 F. Supp. 3d at 1278.

The Government's reliance on various dictionary definitions is unavailing, as these definitions do not conclusively identify the anchoring material as the key distinction between wood screws and self-tapping screws. To advance its argument that the anchoring material controls our interpretation of the tariff terms, the Government selects a definition of "wood screw," which defines the screw as a "pointed metal screw formed with a sharp thread of comparatively co[a]rse pitch for insertion in wood." *GRK IV*, 180 F. Supp. 3d at 1274 n.23 (quoting *Webster's Third New International Dictionary* 2631 (Philip Babcock Gove, Ph.D. and Merriam-Webster Editorial Staff eds. 1993)). However, a wide variety of other dictionary definitions note that self-tapping screws can be anchored into wood as well as other materials. *Id.* at 1274 n.26. For example, the Academic Press Dictionary of Science and Technology defines a self-tapping screw as "a specially hardened screw *used in wood and soft metals* that self-cuts its own threads into the material being worked on." *Id.* (emphasis added). Other dictionaries do

not specify the anchoring material as relevant to the definition of self-tapping screws, but focus on the hardened nature of such screws. *Id.* at 1277–78. The McGraw-Hill Dictionary of Scientific and Technical Terms provides that a self-tapping screw has a "specially hardened thread that makes it possible for the screws to form their own internal thread in sheet metal and soft materials when driven into a hole." *Id.* at 1274 n.26. Similarly, the Encyclopedia of Building and Construction Terms defines a self-tapping screw as a "hardened steel screw with a special, partially slotted shank which, as it is screwed into a plain hole, will cut or form its own threads." *Id.* Again, these definitions do not require self-tapping screws to be anchored in any specific kind of material. The dictionary definitions of record do not strongly weigh in favor of the Government's interpretation that self-tapping screws can only be anchored in non-resilient material.

The Government also relies on a Court of Customs and Patent Appeals case, *Trans-Atlantic Co. v. United States*, 68 Cust. Ct. 105 (1972), for the proposition that this court should adopt a use-based definition of "wood screws" similar to that determined under the old Tariff Schedule of the United States provisions ("TSUS"). Appellant's Br. 23. In *Trans-Atlantic*, the Customs Court considered the TSUS tariff term "wood screws" to be those screws "primarily used in wood." 68 Cust. Ct. at 108. But cases resolved under the TSUS are not binding on this court as the TSUS operated under an entirely different set of interpretative rules, known as the General Headnotes and Rules of Interpretation. *JVC*, 234 F.3d at 1355.

In any event, *Trans-Atlantic* has little bearing on our interpretation of "other wood screws" under the HTSUS. We noted in *JVC Co. of America v. United States* that the prior TSUS cases may be considered instructive in interpreting HTSUS headings when the nomenclature at issue

has not changed. *Id.* Here, the TSUS did not contain an *eo nomine* or use provision for self-tapping screws. The addition of the self-tapping screw subheading in the HTSUS represents a significant change in nomenclature, one that highlights the applicability of the *eo nomine* provisions while rendering less probative prior interpretations of the TSUS. We thus decline to extend the holding in *Trans-Atlantic* to our interpretation here of the disputed *eo nomine* HTSUS subheadings.

Lastly, we see no error in and decline to depart from the Court of International Trade's interpretation of the common and commercial meanings of "other wood screws" under HTSUS 7318.12 and "self-tapping screws" under HTSUS 7318.14. The court properly applied the GRIs and consulted the explanatory notes, dictionary definitions, and expert testimony before reaching its constructions. *GRK IV*, 180 F. Supp. 3d at 1271–80.[5] We conclude

---

[5] The Government argues that the subheading for another type of screw, "coach screws" under subheading 7318.11, indicates that the anchoring material is the critical distinction between wood screws and self-tapping screws. The Government does not argue that GRK's screws fall within subheading 7318.11. Rather, the Government asks us to apply GRI 6, which provides that "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the above rules on the understanding that only subheadings at the same level are comparable." As we find that the Court of International Trade's application of GRI 1 is sufficient to define the *eo nomine* provisions at issue at the sixth-digit level, we need not reach GRI 6. *Schlumberger*, 845 F.3d at 1163 ("The GRI apply in numerical order, meaning that subsequent rules

that the Court of International Trade appropriately looked to design characteristics that distinguish wood screws from self-tapping screws. *Id.* at 1278. For the reasons set forth in the Court of International Trade's opinion, we find these common and commercial meanings of "other wood screws" and "self-tapping screws" to be amply supported by the source material of record without further elaboration. We thus hold that (1) the common and commercial meaning of "other wood screw" under HTSUS 7318.12 is "a screw that forms its own thread by compressing surrounding material designed to fasten wood to wood or other fibrous material," and (2) the common and commercial meaning of "self-tapping screw" under HTSUS 7318.14 is a "specially hardened screw, that meets minimum torsional strength requirements, that can cut away material to form a mating thread in non-fibrous material, and is designed to fasten non-fibrous materials, such as metal, to either fibrous or non-fibrous materials."

## CONCLUSION

We decline to accept the Government's invitation to elevate the role of use in our interpretation of the *eo nomine* provisions at issue here. On remand, the Court of International Trade complied with this court's command in *GRK II* that it consider "use" in its review of the scope of the disputed HTSUS terms. Because the Court of

---

are inapplicable if a preceding rule provides proper classification." (citing *Mita Copystar*, 160 F.3d at 712)). In any event, we agree with the Court of International Trade's conclusion that the specific identification of "coach screws" as a type of "wood screws," only serves to reinforce the fact that the subheadings of "other wood screws" and "self-tapping screws" are distinct and mutually exclusive. *GRK IV*, 180 F. Supp. 3d at 1273 n.22.

International Trade properly applied the GRIs and appropriately considered the screws' intended use in crafting its interpretations of the *eo nomine* provisions of "other wood screws" and "self-tapping screws," we affirm the judgment of the Court of International Trade that GRK's three imported screws are properly classified as "self-tapping screws" under HTSUS 7318.14.10.

**AFFIRMED**

COSTS

No costs.